In the Matter of V. Leon **MARTINDALE** and Lila Martindale, Debtors.

Bankruptcy No. 90–01053.

United States Bankruptcy Court, D. Idaho.

March 20, 1991.

Teresa K. Sturm, Hopkins, French, Crockett, Springer & Hoopes, Idaho Falls, Idaho, for debtors.

Ron Kerl, Green, Service, Gasser & Kerl, Pocatello, Idaho, for Farm Credit Bank of Spokane.

## MEMORANDUM OF DECISION

JIM D. PAPPAS, Bankruptcy Judge.

After a lengthy evidentiary hearing, the Court took under advisement the Debtors' Objection to the claim in this case of the Creditor, Farm Credit Bank of Spokane (hereinafter "FCB"), together with issues concerning confirmation of Debtors' proposed modified plan of reorganization filed January 29, 1991 (the "plan"). After due consideration of the testimony and evidence submitted at the hearing, the oral and written arguments of counsel for the parties, and the record herein, the Court enters this

Memorandum of Decision which shall constitute the Court's findings of fact and conclusions of law. B.R. 7052.

## BACKGROUND

Debtors are farmers who have been unable to service their debt, including the mortgage held by FCB on all of their real property. The Debtors have proposed through their modified plan of reorganization to dispose of their farm land and equipment, either through sale or surrender to secured creditors, in satisfaction of their debt.

All creditors casting ballots have voted to accept Debtors' plan with the exception of FCB. FCB has also filed the only objection to confirmation of the plan claiming that the treatment of its claim therein is not "fair and equitable" as required by Section 1129(b)(1) of the Bankruptcy Code. Debtors seek to confirm the plan over FCB's objection, and they further object to inclusion within FCB's creditors' claim certain charges incurred by FCB for attorney fees and costs during the pendency of the bankruptcy case.

Debtors' plan provides for satisfaction of FCB's claim in several ways. First of all, prior to the confirmation hearing the Debtors had agreed to sell to third parties for cash two small contiguous parcels of land, subject to the FCB mortgage, consisting of Debtors' house and approximately 80 acres. According to the testimony of Mr. Martindale, the closing of this sale is imminent although certain details concerning the buyers' financing have yet to be finalized. Assuming the sale closes as proposed, it would generate approximately $101,000 [1] in net sale proceeds which Debtors offer to immediately pay over to FCB for application to the mortgage balance.

Next, Debtors also propose to surrender to FCB, upon confirmation of their plan, a portion of their farm property commonly referred to by the parties as the "dry farm." While not expressed in the plan, it is understood that the surrender to FCB would be accomplished in such a manner so as to allow FCB to market this property and have access to the sale proceeds to apply to the claim balance. No offer to buy the property currently exists, and undoubtedly some period of time will be required to accomplish a sale. However, Debtors propose an immediate credit against FCB's claim for the anticipated sale proceeds.

Finally, Debtors propose to sell the remainder of their farm property, referred to as the "irrigated farm." This property will be offered for sale by Debtors at the appraised value as determined by FCB's appraiser. Upon sale of the property, the net proceeds from the sale will be turned over to FCB in full satisfaction of any remaining amounts due on its claim. Debtors propose to have up to 300 days within which to conclude such a sale. If they fail to do so, then at the end of the 300 days they will likewise surrender this property to FCB, once again in full satisfaction of the bank's claim.

The following questions must be answered by the Court to dispose of the issues in this case. First, what is the amount of FCB's allowed secured claim for purposes of analyzing its treatment under Debtor's proposed plan? To answer this question, the Court must assign appropriate values to the property securing FCB's claim including Debtors' house and 80 acres, the dry farm, and the irrigated farm, with due regard to the circumstances and proposed disposition of the property under Debtors' plan. See 11 U.S.C. § 506(a). The Court must also determine whether the challenged charges may be included by FCB in its creditor's claim for treatment under the plan. 11 U.S.C. § 506(b). Finally, after determining the amount of the FCB secured claim, the Court must then review the proposed plan to determine whether the treatment of FCB's allowed secured claim

---

**1.** The Court will use approximate dollar amounts in this decision. This is both necessary and practical because of the numerous and variable factors involved in the transactions discussed herein, including the passage of time and accrual of interest. The approximates utilized by the Court have been selected in a manner which should not prejudice either Debtors or FCB.

is in accordance with the Bankruptcy Code. 11 U.S.C. § 1129(b)(2).

## VALUE OF THE REAL PROPERTY

■ Under Section 506(a) of the Bankruptcy Code, FCB has an allowed secured claim to the extent of the value of its interest in the Debtors' interest in the real property subject to its mortgage. "Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest." 11 U.S.C. § 506(a). In this case, Debtors propose to sell certain property immediately; to surrender other property immediately; and to retain and attempt to sell certain property and then, if a sale cannot be accomplished as to that property, to surrender it.

The Court heard testimony from two expert witnesses. Mr. Harris, a local realtor, testified as to land values on behalf of the Debtors. Mr. Kelley, a real estate appraiser, testified on behalf of FCB. The disparity in the quality and credibility of the expert opinion testimony is quite striking. Mr. Harris, whose qualifications are not extremely strong with respect to valuation of real property of this type and location, presented no written report or supporting data to sustain his opinions of value. Rather, the Court perceived his opinions, while submitted in good faith, as largely speculation, not supported by any degree of investigation or specific experience.

Mr. Kelley, on the other hand, whose qualifications include certification as a professional agricultural real estate appraiser by a recognized national society, presented a detailed and comprehensive written report outlining the data and other bases in support of his opinions. It was obvious to the Court that while appraisals always involve a degree of subjective analysis, Mr. Kelley's approach and methodology were far superior. The Court found Mr. Kelley by far to be the more credible witness and his opinions to be more reliable. Therefore, in making its value findings, the Court has relied heavily upon Mr. Kelley's opinions.

As to the house and 80 acres, while FCB objects to the fact that the sale has not yet closed, a written agreement has been executed by the proposed purchasers and substantial earnest money has been tendered. There is enough in the record to suggest that the sale will likely close as agreed. Therefore, the Court is willing to accept the fact that the approximately $101,000 in net sale proceeds will be available to the Debtors to pay to FCB on its claim if the Court were to confirm the plan. These net sale proceeds represent the amount of FCB's allowed secured claim with respect to the house and 80 acres.

■ Moving next to the dry farm, case law in this District instructs that in determining the value of the creditor's interest in property to be surrendered to the creditor under a farm reorganization plan, the Court should take the fair market value of the property and deduct therefrom reasonable projected costs of holding and resale of the property to be incurred by the creditor. *In re Brower*, 89 I.B.C.R. 41, 44 (Callister, D.J.); *see also, In re Racka, Inc.*, 89 I.B.C.R. 302 (Hagan, J.); *In re Peterson*, 82 I.B.C.R. 9 (Young, J.).

In this case, the Court heard evidence from the creditor of the projected costs and expenses of holding and reselling property taken into inventory by FCB in this general geographic area based upon its experience. While precise projections were tendered to the Court, such projections are at best educated estimates. Rather than adopting specific projections, recognizing that the time required to sell the property and that the costs involved in holding and reselling the property will vary somewhat with individual parcels, the Court finds after review of the evidence that it is appropriate to assign a flat ten percent deduction from the fair market value of the property to be surrendered in fixing the value of the creditor's interest therein.[2]

---

**2.** It is emphasized that in adopting such a flat rate discount from fair market value to determine "liquidation value", the Court has reviewed the facts and evidence submitted in this

Utilizing a fair market value on the dry farm of $157,300 as opined by Mr. Kelley, and a ten percent discount for projected holding and resale costs, the liquidation value of the dry farm proposed to be surrendered to FCB under the terms of Debtors' proposed plan is set by the Court at $141,570.

■ Next, as to the irrigated farm, the valuation approach must be slightly different. Debtors in their plan propose to retain the property, lease it out on a crop share basis, and attempt to sell it over a period of 300 days. A fair market value standard is especially appropriate for valuing this parcel under this plan.[3]

Mr. Kelley testified that the value of the irrigated farm could potentially be impaired because of the presence on the property sold with the house and 80 acres of a joint well which services portions of the irrigated farm. In addition, the Court rejects Mr. Harris' testimony as too speculative, that a portion of the irrigated farm property should be valued as potential recreational property capable of development. Based upon the standard announced above, the Court fixes the fair market value of the property for purposes of determining FCB's allowed secured claim at $225,000.

In summary, totaling the values assigned to each of the three portions of the property subject to the FCB mortgage, the Court finds the property has a total value for purposes of determining the amount of FCB's allowed secured claim of $467,570.

## AMOUNT OF THE FCB CLAIM

■ Debtors' challenge three features with respect to FCB's calculation of the amount due to it on its promissory note, secured by the mortgage, on the real property valued above. First, they claim that interest has been improperly accrued on the balances due. Next, they object to FCB's inclusion of attorney fees incurred in

the bankruptcy case. Finally, they object to inclusion of the costs of certain title searches and reports and appraisal fees.

A creditor's claim may be disallowed to the extent it is unenforceable against the Debtors or the Debtors' property under any agreement with the creditor or under applicable law. 11 U.S.C. § 502(b)(1). With respect to determination of a creditor's allowed secured claim, the holder of the claim "shall be allowed ... interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement under which such claim arose." 11 U.S.C. § 506(b). The United States Supreme Court in *United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989), a case involving a secured claim for unpaid federal taxes, held that post-bankruptcy interest on an "oversecured" claim should be allowed without restriction, while recovery of attorney fees and other costs should be allowed only if they are reasonable and provided for in the agreement under which the claim arose. However, in *In re Laguna*, 114 B.R. 214 (9th Cir.BAP 1990), the court distinguished *Ron Pair* as to a real estate mortgage and required that post-petition interest also be provided for in the creditor's underlying agreement as a condition of allowance.

While the cases may seem to be at issue, it will not be necessary for this Court to resolve any potential conflict in this case since the Court finds that all of the interest, attorney fees and other costs are expressly provided for in the promissory note and mortgage executed by the Debtors in favor of FCB, and are otherwise reasonable.

As to the interest charges, Debtors complain that FCB's calculations in effect compute "interest on interest" through use of what the contract calls "default interest." The promissory note, the mortgage securing the note, together with a mortgage

---

particular case. Such should not be interpreted as a discount appropriate, necessarily, to any other case, facts, or property.

**3.** Where a debtor proposes to retain property and continue farming operations under the

plan, the value of the property should be set at its fair market value without deduction for sale or foreclosure costs. *In re Chandler*, 88 I.B.C.R. 153, 154 (Lodge, J.).

reamortization agreement, all executed by the Debtors and received in evidence, provide that any sums not paid when due on the obligation, including costs and expenses incurred by FCB under the terms of the promissory note and mortgage, shall bear interest at the rate in effect for the loan *plus* two percent per annum. As with most notes, the obligation may be accelerated by the lender upon borrowers' default, the whole unpaid balance thereof to then bear interest at the default rate.

Debtors claim that calculating interest in this fashion, which includes, of course, interest calculated on payments not made prior to acceleration of the note, which payments also include interest, is unreasonable and "punitive." Debtors are, of course, correct that default interest is a penalty designed to deter default or late payment, but they cite to the Court no authority which would allow the Court to simply disregard these otherwise valid contractual provisions. Since the default interest terms are clearly set forth and agreed to in the contract documents, and are not unenforceable under state law, the Court has no license to disregard these provisions.

■ With respect to the claims that the attorney fees and other costs incurred by FCB should not be allowed under the terms of the parties' contract, the mortgage provides that FCB may recover any charge arising out of:

> any suit which the mortgagee deems it necessary to prosecute or defend to affect to protect the lien hereof ...

in which case the Debtors agreed to pay:

> a reasonable sum as attorney fees and all costs and legal expenses in connection with said suit, and further agree to pay the reasonable costs of searching records and abstracting or insuring the title [to the mortgaged property]....

*See* Creditor's Exhibit "A", its Proof of Claim. Debtors contend this provision in the contract is not broad enough to cover the charges in question. The Court disagrees. The Court finds it reasonable that

the holder of the mortgage in this case took action to defend its position in light of the Debtors' filing for protection under Chapter 11 of the Bankruptcy Code, and in opposition to the terms of Debtors' proposed plan. This Court agrees with the thoughtful opinion and interpretation of Judge Peterson in *In re Foster*, 84 B.R. 707, 709 (Bankr.D.Mont.1988), where he authorized inclusion of fees and costs to FCB as an oversecured creditor under Section 506(b) based upon a contract provision identical to that here before the Court.

In summary, the Court accepts the calculations by FCB of its claim as presented in the evidence. The amount of FCB's indebtedness would be, as of March 1, 1991, approximately $440,000. Debtors' objection to the FCB proof of claim is therefore overruled, and based upon the value of the property securing FCB's claim, the claim would be fully secured. 11 U.S.C. § 506(a) and (b).

### CONFIRMATION

■ Section 1129(b)(1) of the Bankruptcy Code provides that a reorganization plan may be confirmed, even if not accepted by all impaired classes of creditors, provided the plan is "fair and equitable" with respect to each nonaccepting impaired class. 11 U.S.C. § 1129(b)(1). For purposes of determining whether a plan is fair and equitable with respect to a class composed of creditors holding secured claims, the plan may provide one of three different types of treatment.

The plan may provide that the holder of a secured claim retain its lien on the debtor's property and that it receive deferred cash payments having a present value equal to the amount of the creditor's allowed claim. 11 U.S.C. § 1129(b)(2)(A)(i). The plan may also provide for the sale of any property that is subject to the lien, free and clear of the lien, with the lien to attach to the proceeds of the sale, with the creditor to be paid from the proceeds. 11 U.S.C. § 1129(b)(2)(A)(ii).[4] Finally, the plan may

---

**4.** At first blush, this approach may appear to be what the Debtors are proposing at least with

respect to the irrigated property. Upon closer examination, however, Debtors have not grant-

provide "for the realization by such holders of the indubitable equivalent of such claims." 11 U.S.C. § 1129(b)(2)(A)(iii).

Debtors' plan treatment of FCB's claim, they urge, constitutes indubitable equivalence. That is, Debtors argue that by the combination of a current surrender and deferred sale of portions of the real property subject to the FCB mortgage, that FCB is realizing benefits and rights equivalent in legal and practical consequence to its current status.

FCB disagrees and points to the fact that it currently holds an oversecured first priority mortgage. That is, were Debtors to elect to attempt to satisfy FCB's allowed secured claim through deferred payments, it must be paid in full with all accrued interest, fees and other charges due on the mortgage, together with present value interest over the term proposed for payment. 11 U.S.C. § 1129(b)(2)(A)(i). In addition, assuming all the property was currently liquidated, based upon Mr. Kelly's appraisals and even applying a discount for sales costs to the irrigated parcel, FCB's claim would likewise be paid in full from the proceeds of sale. However, FCB argues, under the terms of the Debtors' plan, because the Debtors retain the right to sell the property for 300 days, then to surrender it if the property cannot be sold within that time, FCB stands the risk, because of accruing interest and charges and additional time required to liquidate the property after surrender, of absorbing a substantial loss on their mortgage.

In the vernacular of modern bankruptcy reorganization, Debtors' approach is a variation of what some refer to as an "eat dirt"

plan. That is, creditors holding liens on real property are compelled to accept a transfer of the real property in part or full satisfaction of their claims. Such plans are controversial, and while not expressly prohibited by the Code, they are frequently rejected by the courts which rarely find transfers of property to be the indubitable equivalent of underlying secured claims. *See* L. King, Collier Farm Bankruptcy Guide, ¶ 3.06[2][c][iv], pp. 3–68–69 (1989). In truth, there is support for such plan provisions in the Code allowing a Chapter 11 debtor's plan to distribute all or any part of the property of the estate among those having an interest in such property. 11 U.S.C. § 1123(a)(5)(D); § 1123(b)(4).

The Court need not decide here whether a property-for-debt plan *per se* violates the fair and equitable treatment rule of Section 1129(b)(2). Perhaps at a different time in a different real estate market a plan proposing to surrender mortgaged land to the mortgagee in return for satisfaction of the debt may be confirmable. However, in an uncertain market it is doubtful that such a plan offers the creditor the indubitable equivalent of its claim unless the appraised value of the property, demonstrated by competent proof, far exceeds the amount of the debt to be paid.

The Courts have struggled with such plans.[5] One Court has defined the elusive term "indubitable" as meaning "too evident to be doubted", *In re Walat Farms, Inc.*, 70 B.R. 330, 334 (Bankr.E.D. Mich.1987), suggesting that a higher standard of proof is required for confirmation of such plans. While there is case law recognizing that the indubitable equivalent

---

ed FCB the right to "credit bid" at any sale, a requirement of Section 1129(b)(2)(A)(ii), nor in fact are the mechanics of any potential sale discussed at all. It is assumed, therefore, that any sale provisions of the plan regarding Debtors' property are offered under Section 1129(b)(2)(A)(iii).

**5.** A good example of the controversy is seen in the history of *In re Sandy Ridge Development Corp.*, 77 B.R. 69 (Bankr.M.D.La.1987), where the court refused to confirm a non-farm plan providing, among other things, for payment of secured debt by property distributions. After the District Court affirmed, the Court of Ap-

peals, in an unpublished opinion, also affirmed the decision and remanded for consideration of sanctions for filing such a plan. After a rehearing, however, a different panel of the circuit reversed the lower courts, *In re Sandy Ridge Development Corp.*, 881 F.2d 1346 (5th Cir. 1989), holding the plan confirmable and remanding the case. As a subsequent opinion makes clear, *In re Sandy Ridge Development Corp.*, 889 F.2d 663 (5th Cir.1989), the holding is probably limited to its facts. *See* L. King, Collier Farm Bankruptcy Guide, *supra*, pg. 3–72, n. 99.

language of Section 1129(b)(2)(A)(iii) likely contemplates nonmonetary satisfaction of claims, *see, e.g., In re Sun Country Development, Inc.,* 764 F.2d 406, 409 (5th Cir. 1985), stringent standards of equivalence are required with respect to non-cash treatment. *See also In re American Mariner Industries, Inc.,* 734 F.2d 426, 434 (9th Cir.1984). Satisfaction of a secured claim by distributions of property should only be permitted if a showing can be made by a debtor that the property transferred is the equivalent of cash to be paid on sale of the property or of installment payments secured by a continuing lien on the property. *In re Future Energy Corp.,* 83 B.R. 470, 495 (Bankr.S.D.Ohio 1988). For example, in *Sun Country,* the Court approved a property-for-debt plan provision calling for the transfer of property worth $287,500 as against a debt of only $153,500. *Sun Country,* 764 F.2d at 409. Certainly, indubitable equivalent treatment should not be less favorable than a deferred payment or sale provision as described in Section 1129(b)(2)(A)(i) and (ii). *See* 5 L. King, Collier on Bankruptcy, ¶ 1129.03[4][c], p. 1129–76 (15th ed. 1990).

■ Put another way, the preponderance of the evidence in the form of the appraisers' testimony may demonstrate a property value at a certain dollar amount. However, because of the imprecision inherent in this kind of proof, the dollar value shown may not necessarily constitute the indubitable equivalent of a cash payment to the creditor in a like amount. *See, e.g., Sandy Ridge,* 77 B.R. at 73 ("If reasonable people can differ on the valuation of property, the valuation might be proved by a preponderance of the evidence but the conclusion would not be 'indubitable.' "); *Walat Farms,* 70 B.R. at 334 ("[T]he market for farm real estate here and now is not such which would permit us to hold that the value of the land being offered is the indu-

bitable equivalent of [the creditor's] claim.").

Applying the less than clear legal principles discussed above to the facts of this case leads the Court to the conclusion that Debtors' plan, as presently written, does not provide FCB with the indubitable equivalent of its allowed secured claim, and therefore the plan treatment is not fair and equitable to FCB and cannot be confirmed. There are several plan features compelling such opinion.

First of all, the Court assumes for discussion that the house/80 acre sale nets FCB $101,000; that the dry farm is surrendered to FCB for an immediate liquidation value credit of $141,570; and that the irrigated farm is not sold within 300 days of confirmation,[6] and at that point in time the irrigated farm is also surrendered to FCB. The balance due to FCB on its secured claim after the sale of the house and acreage and the dry farm surrender would be approximately $197,430 (i.e., $440,000 claim balance (minus) $101,000 sale proceeds (minus) $141,570 dry farm surrender credit). This balance would continue to accrue interest which, after 300 days at an 11% annual rate, for example, would mean a balance due to FCB of about $215,530.

At that point, Debtors would surrender the irrigated farm, and even assuming no decline in value, and that Debtors have paid all costs associated with the retention of property (i.e., maintenance, water charges, real estate taxes, etc.), FCB is confronted with a potentially substantial loss. That is, it must attempt then to market the property having a market value of $225,000. Once again assuming some additional time is required to sell the property,[7] FCB will incur holding and sales costs, and the net return upon sale may well fall far short of full payment.

Even under a liberal standard of proof, which as noted above may not be appropri-

6. It may seem pessimistic that Debtors will not sell the irrigated farm within 300 days of confirmation. However, to properly analyze the possible treatment of FCB's claim, this approach is required.

7. This assumption may be suspect since under the plan Debtors would have been attempting to sell this parcel at the FCB appraised value for 300 days. To sell the property, it may be necessary at such time for FCB to discount the price, further exacerbating their position.

ate, FCB has not come close to realizing the indubitable equivalent of payment in full. There is simply inadequate value in the property to justify this approach.

Debtors' approach also gives them little incentive to aggressively attempt to market the property in question, since they suffer no adverse consequences if the property does not sell within 300 days. In fact, by leasing the property out on a crop-share basis as they have done, there is every reason for them to allow the lessees to successfully complete the farming season prior to any sale. If the plan were confirmed now, surrender to FCB at the end of 300 days would hardly allow the bank much effective time to market the property prior to commencement of another farm season, potentially requiring FCB to retain the property for another year prior to sale. The presence of the lease itself may burden the salability of the property. *See In re Sloan*, 57 B.R. 91, 94 (Bankr.D.S.C.1985).

There is also no explanation by Debtors as to why they should be able to retain the income generated from the irrigated farm prior to its sale or surrender without any proposed payment to FCB on the underlying mortgage. Viewing the rest of the plan, it appears that there is adequate cash available to Debtors to treat other creditors fairly and yet compensate FCB for delay in payment of its claim.

Finally, Debtors' decision to liquidate the mortgaged property in parcels, rather than in one unit, is possibly prejudicial to FCB, largely because of the resulting need for a joint well use agreement between prospective purchasers of the property. While carving up the farm may benefit Debtors by allowing an immediate sale of the small parcel, to be "fair and equitable" such decision must also take into consideration any difficulties created in selling the remaining parcels. *See In re Wester*, 84 B.R. 770, 772 (Bankr.N.D.Fla.1988) (burden is on debtor to prove that "piecemeal carving up of the property subject to lien of [creditor] will not result in a diminution in value of the remaining property...").

In summary, several factors evident in this plan constrain the Court to reject it.

Were there a larger equity cushion in the plan to ensure payment to FCB upon surrender of the property; were there an effort to compensate the creditor for any delay in sale by ongoing payments; and were there safeguards within the plan which would ensure an aggressive marketing effort for the property, the result may have been different. However, this plan is not fair and equitable in its treatment of FCB and confirmation will be denied by separate order.

### CONCLUSION

By separate order, Debtors' objection to FCB's claim will be overruled. In addition, confirmation of Debtors' plan will be denied. Debtors will be allowed fifteen (15) days from the date of the order within which to submit a confirmable modified plan, and to schedule the same for a hearing, or the case will be dismissed upon request of an interested party, without further hearing.