Michael B. BATLAN, Trustee for the Bankruptcy Estate of Smith's Home Furnishings, Plaintiff,

v.

TRANSAMERICA COMMERCIAL FINANCE CORPORATION, Defendant.

Civil No. 99–400–JO.
Bankruptcy No. 395–35704–elp7.
Adversary No. 97–3390.

United States District Court, D. Oregon.

Aug. 17, 1999.

Johnston A. Mitchell, Bullivant, Houser, Bailey, Pendergrass & Hoffman, Portland, OR, Kenneth N. Klee, K. John Shaffer, Stutman, Treister & Glatt, Los Angeles, CA, for Plaintiff.

Jennifer L. Palmquist, Garvey, Schubert & Barer, Portland, OR, for Defendant.

## OPINION AND ORDER

ROBERT E. JONES, District Judge.

Plaintiff-appellant Michael Batlan ("trustee"), the trustee of the debtor's bankruptcy estate in *In re Smith's Home Furnishings, Inc.*, Bankr.Ct. Case No. 395–35704–elp7, appeals a final decision by the bankruptcy court in favor of defendant-appellee Transamerica Commercial Finance Corporation ("TCFC") in an adversary proceeding, *Batlan v. Transamerica Commercial Finance Corporation*, B.C. Adv. Pro. No. 97–3390–elp7. Pursuant to 28 U.S.C. § 158(c)(1), TCFC elected to have the appeal heard by this court instead of the bankruptcy appellate panel; consequently, this court has jurisdiction over the appeal pursuant to 28 U.S.C. § 158(a)(1).[1]

---

1. This is an "appellate" review of a final decision of the bankruptcy court, not a review of findings and recommendations in non-core proceedings under 28 U.S.C. § 157(c)(1) and Bankr.R. Civ. Pro. 9033.

## NATURE OF THE ACTION AND PROCEEDINGS BELOW

The debtor, Smith's Home Furnishings, Inc. ("Smith's"), filed a petition for relief under chapter 11 of the Bankruptcy code on August 22, 1995 (the "Petition Date"). Smith's attempt to reorganize failed, and on October 11, 1995, the bankruptcy case was converted to a chapter 7 liquidation and the trustee was appointed.

Through his investigation, the trustee learned that during the 90 days before the Petition Date (a period referred to as the "preference period"), Smith's had reduced its debt to TCFC, one of its primary secured creditors, by making 36 separate payments totaling $12,842,438.96. On March 12, 1997, the trustee demanded return of the money. When TCFC refused, on July 29, 1997, the trustee commenced an adversary proceeding, seeking to avoid the transfers as preferential under Bankruptcy Code section 547(b)(5), and to recover the preferential transfers for the benefit of Smith's other creditors under Bankruptcy Code 550(a).

Before trial, the parties stipulated to a Joint Statement of Agreed Facts. The effect of the stipulation was to eliminate any dispute of fact as to four of the five elements necessary to demonstrate a preferential transfer under section 547(b)(5). The case proceeded to trial on the fifth element (discussed below), and (as relevant) on TCFC's one remaining affirmative defense, the "improvement of position" defense under section 547(c)(5).

A two-day trial was held May 6 and 7, 1998, before Judge Perris. In a letter opinion issued September 10, 1998, Judge Perris ruled that the trustee failed to prove that TCFC received a greater percentage as a result of the 36 payments and that, therefore, the transfers were not "preferential" within the meaning of section 547(b)(5). In so ruling, Judge Perris found TCFC to be a secured creditor; that the TCFC's collateral should be valued based upon its liquidation value; and that although the cost of liquidation should be deducted, the trustee had failed to produce evidence from which the costs of liquidation could be determined. Based upon these findings, Judge Perris ruled that the trustee had failed to prove the 36 payments were preferential and, consequently, that she need not consider TCFC's affirmative defense.

On September 16, 1998, the trustee filed a motion for reconsideration. As a result of the motion, the bankruptcy court amended the findings to correct certain typographical and calculation errors, but otherwise confirmed the judgment in favor of TCFC. The trustee timely filed a notice of appeal of the bankruptcy court judgment on October 16, 1998.

## STATEMENT OF FACTS

### Smith's Finances

Smith's was in the business of selling electronic goods, furniture, appliances, and related accessories. Smith's had 19 retail stores and two distribution warehouses located in Oregon, Washington, and Idaho. In the fiscal year ending January 31, 1995, Smith's sales exceeded $261 million. In the seven months that culminated in Smith's chapter 11 filing, Smith's had sales of approximately $122.5 million.

TCFC was one of Smith's primary lenders for nearly a decade. TCFC financed Smith's purchases of a variety of brand name retail merchandise consisting primarily of electronic goods and appliances, including televisions, stereo equipment, and computers (the "Prime Inventory"). TCFC held a first priority lien in the Prime Inventory and the proceeds from it. TCFC also held a blanket lien on Smith's other assets, junior only to the prime collateral liens of Smith's other secured creditors. Because TCFC held a "floating lien" and made frequent advances to Smith's, the value of TCFC's collateral and the amount of Smith's debt were constantly changing.

Under the terms of its loan documents, TCFC advanced credit to Smith's by granting approval to various manufacturers. After receiving approval from TCFC, the manufacturer would ship products to Smith. When Smith's sold products financed by TCFC, Smith's would pay TCFC the wholesale invoice cost of each product sold. However, Smith's did not earmark its receipts or segregate funds for payment of any of its creditors. Instead, at the end of each day Smith's deposited the proceeds of the day's sales into commingled bank accounts. First Interstate Bank ("FIB"), Smith's revolving line of credit financier, would sweep the commingled bank accounts daily, leaving them with zero overnight balances. If sufficient collateral were available the next day, FIB would advance new funds to Smith's. From these advances, Smith's obtained funds to pay its operating expenses and its creditors, including TCFC. Thus, Smith did not make the disputed 36 payments to TCFC directly from proceeds of sale of TCFC's collateral.

### Smith's Financial Woes

Beginning in 1994, Smith's fortunes began to change for a variety of reasons, including rapid expansion, increased competition, bad publicity, and unskilled management, and Smith's sales continually fell short of projections. Smith's financial problems were aggravated by "ever-tightening" credit terms imposed by its major creditors. During the fiscal year ending January 31, 1995, Smith's suffered pre-tax losses of nearly $14 million. During the next seven months, Smith's suffered additional pre-tax losses of more than $16.5 million.

TCFC began to express serious concerns about Smith's financial condition in late 1994. In March 1995, TCFC notified Smith's that it had reduced Smith's line of credit from $25 million to $20 million. TCFC further reduced Smith's line of credit to $15 million in May 1995, and to $13 million by August 1995. During this same time period, TCFC demanded sub-stantial pay downs of Smith's obligations. Smith's complied, paying TCFC essentially all of its available cash. In all, Smith's made 36 payments totaling $12,842,438.96 to TCFC during the period from May 26, 1995, through August 21, 1995.

On August 18, 1995, TCFC declared a final default, accelerated the entire debt Smith owed, and sought a receiver for the company. In the receivership action, TCFC also sought, for the first time, to require Smith's to segregate the proceeds from the sale of TCFC's collateral.

On August 22, 1995, Smith's filed a petition for relief under chapter 11. The bankruptcy filing left thousands of creditors holding in excess of $57 million in scheduled claims, including over a million dollars in unpaid taxes, employee wages, and customer deposit claims.

### Smith's Bankruptcy and the Liquidation of TCFC's Collateral

All of Smith's stores closed on the Petition Date, and many never reopened. Smith's continued to operate some stores for about a month after filing the chapter 11 petition. On October 5, 1995, Smith's closed its doors permanently and ceased operations. On October 11, 1995, the case was converted to a chapter 7 liquidation, and the trustee was appointed.

As of the Petition Date, Smith's had reduced its outstanding obligation to TCFC to $10,728,809.96. During the few weeks Smith's operated under chapter 11, Smith's paid TCFC an additional $1,568,659.47 from sales of TCFC's collateral. After the October 11 conversion, the trustee allowed TCFC and the other collateralized creditors to liquidate their collateral. TCFC obtained relief from the automatic stay and took possession of the Prime Inventory and the remaining collateral that was subject to TCFC's blanket security interest. TCFC then liquidated substantially all of its collateral, yielding additional gross proceeds of $9,254,351.11. TCFC asserted a deficiency of $412,633

after receiving the proceeds of the liquidation.

Smith's bankruptcy case currently is "administratively insolvent" in that there are insufficient assets in the estate to pay chapter 11 administrative expenses in full. Further, no distributions will be made on account of any pre-petition claims, unless the trustee were to recover the disputed amounts paid to TCFC during the 90 day preference period. Hence, the present appeal.

### The 36 Payments to TCFC

As stated, the parties entered into a Joint Statement of Agreed Facts for purposes of trial. *See* Appellee's Excerpts of Record, Tab 6. As pertinent to the issues on appeal, the parties stipulated that:

8) Each transfer * * * was a transfer of an interest of Smith's in property and made to or for the benefit of TCFC. 11 U.S.C. § 547(b)(1).

9) Each transfer * * * was made on account of an antecedent debt. 11 U.S.C. § 547(b)(2).

10) Each transfer * * * was made while Smith's was insolvent. 11 U.S.C. § 547(b)(3).

11) Each transfer * * * was made on or within the 90 days before the filing of the petition. 11 U.S.C. § 547(b)(4).

12) The ninetieth day before the Petition Date is May 24, 1995.

13) TCFC had a first priority lien on its Prime Inventory, and the proceeds thereof, which consists of brand name products listed on Smith's Perpetual Level Inventory Reports ("Inventory Reports"), and a first priority blanket lien on all of Smith's assets ("Blanket Lien Collateral") * * *.

14) On May 24, 1995, Smith's owed TCFC the sum of $13,410,032.25.

15) On August 22, 1995, Smith's owed TCFC the sum of $10,728,809.96.

* * *

19) The wholesale invoice cost of TCFC's Prime Inventory at the beginning of the day on May 24, 1995, was $12,708,605.96 * * *.

20) The wholesale invoice cost of TCFC's Prime Inventory at the beginning of the day on August 22, 1995, was $10,131,317.79 * * *.

21) The wholesale invoice cost of TCFC's Prime Inventory at the beginning of the day on October 4, 1995, was $8,424,468.39 * * *.

22) To date, TCFC calculates that the gross amount of the proceeds derived from the liquidation of its inventory is: (i) $7,786,540.11 for its Prime Inventory; (ii) $113,000 for its "Service" inventory; and (iii) $142,000 for its "Not Available For Sale" inventory. The sum of these proceeds is $8,041,540.11.

23) TCFC calculates that the current principal balance of the debt owed by Smith's to TCFC is $412,632.53 * * *.

24) To date, TCFC has received $1,212,-811.00 in cash proceeds for its collateral (excluding Prime Inventory) * * *.

* * *

27) Except for three vehicles, all of Smith's assets were subject to secured inventory liens and blanket liens.

28) Smith's had no unencumbered assets available for distribution to creditors holding unsecured claims on August 22, 1995.

Appellee's Excerpts of Record, Tab 6.

### ISSUES ON APPEAL

The parties disagree as to the issues on appeal. The trustee's Statement of Issues is unduly argumentative. I believe the following accurately reflects the issues before me:

1. Did the bankruptcy court properly construe the "greater percentage" test under section 547(b)(5)?

2. Did the bankruptcy court err in finding that the trustee failed to prove that the payments to TCFC were not preferential?

3. Did the bankruptcy court err in finding that the trustee failed to prove TCFC's liquidation costs and in refusing to deduct any costs?

4. Did the bankruptcy court err in refusing to admit Exhibit 54?

## STANDARDS OF REVIEW

A bankruptcy court's conclusions of law are reviewed *de novo*. *Grey v. Federated Group, Inc. (In re Federated Group, Inc.),* 107 F.3d 730, 732 (9th Cir.1997). The bankruptcy court's findings of fact cannot be set aside unless "clearly erroneous," Fed. R. Bankr.Pro. 8013.[2] Mixed questions of law and fact are reviewed *de novo. In re Amy Chang,* 163 F.3d 1138, 1140 (9th Cir.1998). The bankruptcy court's evidentiary rulings are reviewed for abuse of discretion. *In re Gergely,* 110 F.3d 1448, 1452 (9th Cir.1997).

## DISCUSSION

The adversary proceeding focused entirely on whether all or any of the 36 payments were avoidable preferences within the meaning of the Bankruptcy Code. Section 547 governs preferences, and section 547(b) specifically permits the trustee to "avoid any transfer of an interest of the debtor in property"

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

(A) on or within 90 days before the date of the filing of the petition;

* * *

(5) that enables such creditor to receive more than such creditor would receive if—

(A) the case were a case under chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

11 U.S.C. § 547(b).

■ As outlined above, the parties dispute only whether the last element—section 547(b)(5)—was met. To prevail at trial, the trustee was required to prove that TCFC received more than it would have if the case were a chapter 7 liquidation case, the transfer had not been made, and TCFC received payment of the debt to the extent provided by the Bankruptcy Code. *See In re Powerine Oil Co.,* 59 F.3d 969, 972 (9th Cir.1995). This commonly is known as the "greater percentage" or "greater amount" test. *See In re Lewis W. Shurtleff, Inc.,* 778 F.2d 1416, 1421 (9th Cir.1985).

■ In applying the greater amount test, the bankruptcy court must construct a hypothetical chapter 7 case as of the petition date and determine what the creditor would have received if the case had proceeded under chapter 7. *See In re Sufolla, Inc.,* 2 F.3d 977, 985 (9th Cir.1993)(citing *Neuger v. United States (In re Tenna Corp.),* 801 F.2d 819 (6th Cir.1986)). In doing so, the bankruptcy court is not prohibited from considering the actual facts of the case. *In re LCO Enterprises,* 12 F.3d 938, 942 (9th Cir. 1993)(" 'The hypothetical liquidation under section 547(b)(5) should not * * * be conducted in a vacuum' " (citation omitted)).

---

**2.** Fed. R. Bankr.Pro. 8013 provides, in relevant part: "Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of witnesses."

■ Section 547(b)(5) is silent regarding the point in time for analyzing whether a payment is preferential. "But § 547(b)(5) has been construed to mean that the court must determine the relative positions of the creditors on the date the petition is filed." *In re LCO Enterprises,* 12 F.3d at 942 (citing *Palmer Clay Prods. Co. v. Brown,* 297 U.S. 227, 229, 56 S.Ct. 450, 80 L.Ed. 655 (1936)). In *Palmer Clay,* the Supreme Court, construing the preference provision of the former Bankruptcy Act, observed

> Whether a creditor has received a preference is to be determined, not by what the situation would have been if the debtor's assets had been liquidated and distributed among his creditors at the time the alleged preferential payment was made, but by the actual effect of the payment as determined when bankruptcy results.

297 U.S. at 229, 56 S.Ct. 450. The Court further commented that

> We may not assume that Congress intended to disregard the actual result, and to introduce the impractical rule of requiring the determination, as of the date of each payment, of the hypothetical question: what would have been the financial result if the assets had then been liquidated and the proceeds distributed among the then creditors?

*Id.* Thus, the petition date is the relevant date for purposes of the hypothetical creditor test under section 547(b)(5). *In re Castletons, Inc.,* 990 F.2d 551, 554 (10th Cir.1993).

■ Whether the requirements of section 547(b)(5) are met also turns, in important part, on the status (secured, partially secured, or unsecured) of the creditor to whom the transfers were made. "Prepetition payments to a fully secured creditor generally 'will not be considered preferential because the creditor would not receive more than in a chapter 7 liquidation.' " *In re Powerine,* 59 F.3d at 972 (*quoting* 4 Collier on Bankruptcy ¶ 547.08, at 547–47 (Lawrence P. King ed., 15th ed.1995)); *see also In re Castletons,* 990 F.2d at 554 (same). In other words, a transfer is not preferential if the creditor's post-petition status would not have been any different had the transfers not been made and the remaining creditors were not adversely affected as a consequence of those transfers. *In re Castletons,* 990 F.2d at 555.

■ Finally, section 547(g) mandates that the trustee bears the burden of proving the avoidability of a transfer under section 547(b). 11 U.S.C. § 547(g).

### 1. *The Bankruptcy Court's Application of Section § 547(b)(5).*

As a preliminary matter, in its effort to construct the required hypothetical chapter 7, the bankruptcy court was required to determine, as of the Petition Date, the class of creditor to which TCFC belonged—fully secured or undersecured. *See* discussion above; *see also In re Powerine,* 59 F.3d at 972. Smith's owed TCFC $10,728,810 on the Petition Date. To determine whether TCFC was fully secured or undersecured as of that date, the court first had to decide the value of TCFC's collateral as of the Petition Date, so the debt and collateral could be compared. That decision, in turn, required the court to settle on a method of valuation.

After noting that the Bankruptcy Code does not define "value" and that the Ninth Circuit has not spoken on the issue, and after considerable analysis, Judge Perris decided that the appropriate measure under the circumstances was liquidation value, given that the collateral had, in fact, been liquidated with the trustee's blessings. Letter Opinion, pp. 3–5. The trustee does not challenge Judge Perris' method of valuation, only her decision not to deduct the alleged costs of liquidation, which resulted in a greater net value. Judge Perris' ruling concerning the liquidation costs is discussed below. For purposes of the present discussion, however, I

assume that her valuation is not "clearly erroneous" and is, therefore, correct.

The trustee argues that the bankruptcy court erred as a matter of law in construing and applying the "greater amount" test of section 547(b) because, according to the trustee, the court required the trustee to "prove that Transamerica was undersecured as of the date of each of the thirty-six payments it received." Appellant's Opening Brief, p. 24. The trustee elaborates on this argument, contending that:

> Effectively, the Bankruptcy Court held that (1) the greater percentage test must be applied as of the date of each payment, rather than as of the commencement of the bankruptcy case, and (2) a creditor that is fully secured at the time of the transfer can never receive a preference. In so holding, the Bankruptcy Court made two fundamental errors of law that are contrary to binding Supreme Court and Ninth Circuit precedent and the plain language of section 547(b).

Appellant's Opening Brief, pp. 24–25.

The trustee's argument focuses on the following statements in the Letter Opinion:

> The trustee argues that, even if defendant was fully secured as of the date of bankruptcy, the payments were preferential because they effectively changed defendant's status from an undersecured creditor to a fully secured creditor, with the result that defendant obtained more from the transfers than it would have received had the transfers not been made. Even under the trustee's theory, if the payments were made on a fully secured claim, defendant was not preferred. Assuming that his legal theory is sound, * * * *the trustee's proof does not establish that defendant was undersecured at the time the payments were made.*
>
> [D]efendant had a floating lien and made frequent advances of credit to debtor.

As a result, the amount of collateral and thus its value was constantly changing. Likewise, the amount of debtor's debt to defendant was constantly changing. *The trustee has not presented evidence from which I could determine that defendant was undersecured when the payments were made. Consequently, he has not met his burden of proving that defendant was an undersecured creditor at the time it received one or more of the payments, and thus has not shown that the payment(s) allowed defendant to obtain more than it would have received in a Chapter 7 liquidation.*

Letter Opinion, pp. 8–9. In a footnote, the court also noted that

> The court would have to know the value of the collateral and the amount of the debt on the date of each transfer in order to determine whether defendant was undersecured at the time of one or more of the transfers and became fully secured by the time of the bankruptcy as a result of the payments at issue.

Letter Opinion, p. 8 n. 8.

The trustee contends that the above statements demonstrate that the bankruptcy court misapplied the law of preferences. According to the trustee, rather than constructing a hypothetical chapter 7 as of the Petition Date, the bankruptcy court erroneously held that is was necessary to perform a hypothetical liquidation analysis with respect to TCFC as of the date of each of the 36 payments. The trustee misinterprets Judge Perris' ruling.

Judge Perris was faced with the following situation. TCFC was a secured creditor with a floating lien on Smith's inventory. Smith owed TCFC $10,738,810 as of the Petition Date. The liquidation value of the collateral on the Petition Date (as determined by Judge Perris) was $10,828,004.36, or approximately $89,000 (actually $94,200)[3] more than Smith owed TCFC on

---

3. These numbers were adjusted slightly in the order amending the findings. As a result of the adjustment, Judge Perris ultimately found that the value of TCFC's collateral as of the Petition Date exceeded Smith's debt by $94,-

that date. Thus, TCFC was fully secured as of the Petition Date and would be entitled to receive 100 percent of its claim in a chapter 7 liquidation.

The trustee made two basic arguments. First, the trustee argued that the entire amount paid during the preference period should be avoided. The trustee's rather simplistic theory is as follows. Smith's paid TCFC $12,842,438.96 in 36 payments during the preference period. TCFC received $10,823,010.58, as determined by the bankruptcy court, in the post-petition sale of the collateral. Thus, TCFC received, altogether, $23,665,449.54, or $12,-842,438.96 more than it would have received "had the transfer[s] not been made." Additionally, the trustee contended that he was entitled to recover any transfer to the extent it improved TCFC's position from an undersecured to a fully secured creditor during the preference period.

The problem with a simplistic approach, as recognized by Judge Perris, is that TCFC held a floating lien, in which both the collateral and debt changed constantly during the preference period. *See* Appellant's Excerpts of Record, Vol. 5, Tab. 135 (Transcript of Final Pretrial Conference), pp. 1573–83. The pretrial discussion of the issues reflects that Judge Perris was looking for evidence on the issue of TCFC's status as a secured or unsecured creditor at the time of each payment, because, in her words, "the problem when you're a creditor with a floating lien like [TCFC] is that 547(b) doesn't work right for you because you're getting new collateral all the time." *Id.*, at pp. 1573–74. Judge Perris directed those comments to TCFC's attorney, specifically addressing the court's concern that "the mere fact that you're a fully secured creditor on the date of the petition doesn't mean that there was not a preference." *Id.*, at p. 1577.

■ In any event, the trustee did not present evidence that TCFC was undersecured at the time of any of the 36 payments. Consequently, the court had no factual basis on which to rest a conclusion that any of the disputed transfers allowed TCFC to receive more than it would have received in a chapter 7 liquidation. In other words, the trustee's theory assumed that all or a portion of 36 payments permitted TCFC to receive up to $13 million more than it should have, but the trustee failed to prove that TCFC was ever undercollateralized. Without that proof, the trustee failed to bear his burden of proving that the transfers allowed TCFC to receive more in the liquidation than it would have received had the payments not been made.

The Tenth Circuit opinion in *In re Castletons, supra,* casts some light on this issue. In that case, the trustee sought to avoid over $4 million in payments and security interests given by debtor to a floating lien creditor, Zions, during the preference period. The district court, reviewing the bankruptcy court's decision, concluded that "[b]ecause of Zions' preexisting, pre-preference period lien on all accounts receivable, inventory and proceeds, Zions did not receive more from the challenged payments than it would have in a Chapter 7 liquidation." 990 F.2d at 554 (internal quotations and citation omitted).

In affirming the district court, the Tenth Circuit observed that:

> The focus of § 547(b)(5) is the status of the bankruptcy estate at the time of the filing of the petition. Thus, the only controverted issues in this case are whether the post-filing status of the creditor would have been any different had the transfers not been made and whether the remaining creditors were adversely affected as a consequence of those transfers. * * *.

> The evidence answers the questions in the negative. Zions' post-petition status was unaffected, and unsecured creditors would not have received more than is

200.62. Appellant's Excerpts of Record, Vol. 5, Tab 127.

now available in the estate if the transfers had not been made. *Because debtor's assets were subject to valid security interests on the first day of the preference period,* a matter trustee does not contest, *and because the collateral was not sufficient to liquidate all the debts owed to Zions on the date of bankruptcy, the bank's post-petition secured claim would have had to absorb all the assets of the estate if the pre-bankruptcy transfers had not been made.* Consequently, the fluctuation in value of the collateral during the preference period, which trustee sees as bettering the bank's position, is really irrelevant. *This is especially true because all payments to Zions came from assets already subject to its security interest.* It is further uncontested that the nature of Zions' security interest in debtor's assets was never altered during the preference period.

Under these circumstances, it cannot be said, as § 547(b)(5) requires, the transfers enabled Zions to receive more on its debt than would be available to it in a Chapter 7 liquidation.

*In re Castletons,* 990 F.2d at 554–55 (emphasis added).

In sum, I conclude that the bankruptcy court properly construed and applied the "greater amount" test of section 547(b)(5). The court's statements concerning the trustee's failure to prove that TCFC was undersecured at the time of any of the payments address the peculiar proof issues that arise in a floating lien case, but do not reflect misconstruction or misapplication of the law.

### 2. The Bankruptcy Court's Finding re: Liquidation Costs.

As stated above, the bankruptcy court determined that, in the circumstances, the proper measure of the value of TCFC's collateral was net liquidation value, after deduction of liquidation costs. Letter Opinion, p. 6. That ruling has not been

appealed. Instead, the trustee argues that the bankruptcy court "erred as a matter of law" in refusing to deduct any amount for liquidation costs on the ground that "there was no direct evidence of the amount of liquidation costs." Letter Opinion, p. 7.

The trustee contends that the bankruptcy court had sufficient evidence[4] to estimate the liquidation costs, and that even a conservative estimate would demonstrate the TCFC was undersecured, not oversecured by $94,200, on the Petition Date. Moreover, the trustee asserts that the bankruptcy court is required to determine "reasonable projected costs" of liquidation based upon "educated estimates." *See* Appellant's Opening Brief, p. 38 (quoting *In re Martindale,* 125 B.R. 32, 35–36 (Bankr.D.Idaho 1991)).

The evidence on which the trustee relies, and the court's reasons for rejecting it, are as follows:

### a. Testimony of Lawrence Dinaso.

Dinaso was TCFC's Manager of Portfolio Administration during the liquidation. Dinaso admitted in deposition that "it is typical that a secured creditor incurs expenses in liquidating its collateral," and admitted that TCFC actually "incur[red] expenses in liquidating the collateral," including moving, travel, telephone, security, rental expenses, and attorney fees, but also testified that he did not know the actual amount of those expenses. Appellant's Excerpts of Record, Vol. 4, Tab 108, pp. 1250, 1268–70. Dinaso also admitted to preparing an analysis of projected costs (Exhibit 17, Tab 154 of Appellant's Excerpts, Vol. 6), which estimated "Repo Expenses" and "Legal & Professional Fees" at $500,000 and $150,000 respectively. Tab 108, p. 1245; Tab 154. Dinaso also testified, however, that the analysis, prepared two months before the bankruptcy, was a "worst case scenario" and that the numbers were "real rough number[s] out of the air * * *." Tab 108, pp. 1245, 1249.

4. The court's disputed evidentiary ruling is discussed below.

The bankruptcy court gave no weight to Dinaso's testimony, noting that he testified that he did not know the actual amount of TCFC's liquidation costs. She also gave no weight to Dinaso's cost estimates, reasoning that

> Dinaso's deposition testimony indicates that he had no historical background on which to base his estimate of $500,000 repossession costs, and that he pulled that number out of the air. He did not provide any basis for his estimate of $150,000 in legal and other professional fees. Therefore, I give no weight to that evidence, and do not find it probative of the liquidation costs defendant actually incurred.

Letter Opinion, p. 7.

b. *Testimony of Ralph Tuliano.*

Ralph Tuliano is a partner in PriceWaterhouse's corporate restructuring unit. Tuliano testified as an expert on issues related to Smith's financial condition. As pertinent, Tuliano testified that "[i]n order to liquidate the assets, you're going to have to incur certain costs to do that." Appellant's Excerpts of Record, Vol. 5, Tab 136, p. 1749. Tuliano then described the types of costs "you'd" expect, including legal fees, warehousing and transportation costs, and security costs. *Id.*, at pp. 1749–51.

The bankruptcy court gave Tuliano's testimony no weight, noting that he testified generally about the types of costs in a hypothetical liquidation, but did not quantify the probable costs. Letter Opinion, p. 7.

c. *Other Evidence.*

The trustee points to the following additional evidence. TCFC's senior attorney, Eileen Meyer, acknowledged that TCFC incurred actual expenses but said she did not know the amount. James Arimborgo, a TCFC portfolio manager, confirmed that TCFC was required to store the collateral and employed "upwards of 20" people to oversee the liquidation. The trustee himself testified to the efforts TCFC undertook to liquidate the collateral. *See generally* Appellant's Opening Brief, p. 42. Additionally, the trustee points out that despite the fact that TCFC claims that the value of its collateral exceeded the amount of Smith's debt, TCFC still claims that it is owed $412,633. *Id.*

With respect to the $412,633, the bankruptcy court noted that the only evidence presented was Meyer's testimony that she did not believe that the amount included costs of liquidation. The court did not comment on each item of the remaining evidence, but observed overall that

> Given the lack of evidence and the range of possibilities, I decline to infer that defendant incurred liquidation costs in such an amount that defendant was undersecured on the date of debtor's bankruptcy.

Letter Opinion, pp. 7–8.

■ This leaves the question whether, given the evidence that TCFC did incur some costs, the court was *required* to make an educated guess as to what the liquidation costs were. The trustee relies on *In re Martindale, supra,* for the proposition that bankruptcy courts "routinely must estimate sales costs for purposes of valuing a secured creditor's collateral * * *." Appellant's Opening Brief, p. 38.

While the court in *In re Martindale* did, indeed, estimate the costs of sale of the creditor's property, deducting a flat ten percent from fair market value, it is clear from the opinion that the court arrived at that estimate after considering the *evidence of projected costs* proffered by the parties. The court explained:

> In this case, the Court heard evidence from the creditor of the projected costs and expenses of holding and reselling property * * * in this general geographic area based upon its experience. While precise projections were tendered to the Court, such projections are at best educated estimates. Rather than adopting specific projections, recogniz-

ing that the time required to sell the property and that the costs involved in holding and reselling the property will vary somewhat with individual parcels, the Court finds after review of the evidence that it is appropriate to assign a flat ten percent deduction * * *.

*In re Martindale,* 125 B.R. at 35; *see also In re Taffi,* 96 F.3d 1190, 1193 (9th Cir.1996)("value is to be determined by the facts presented to the bankruptcy court").

The evidence presented to the bankruptcy court in this case fell far short of the "precise projections" proffered in *Martindale.* Instead, the only evidence was that TCFC incurred some costs, but that pre-bankruptcy estimates of the numbers were "pulled out of the air." No one, much less the trustee, offered the court evidence from which a reasoned estimate could be made. Thus, it cannot be said that the bankruptcy court's finding that the costs of liquidation could not be determined from the evidence is "clearly erroneous."

### 3. *The Bankruptcy Court's Exclusion of Exhibit 54.*

The above discussion does not address one of the trustee's key evidentiary offerings on the issue of liquidation costs, which the bankruptcy court excluded.

The trustee's proposed Exhibit 54, a document entitled "Smith's," sets forth month-by-month (August 1995–May 1996) and state-by-state (Or., Wa., Id.) costs in certain categories, including attorney, moving expenses, personnel expenses, phone bills, rent, and security. The grand total for all categories in all three states over the covered time period is $1,053,-554.30.

■ The trustee satisfied the bankruptcy court that TCFC prepared the document. Appellant's Excerpts of Record, Vol. 5, Tab 137, p. 1866. Nonetheless, the court excluded it for lack of any foundation as to what the document purports to show. Judge Perris stated:

[T]here's not sufficient evidence to demonstrate it accurately represents actual liquidation costs. It could be projections, it could be a mixture of actual and projected expenses. We have no idea of the date of the preparation of the document or who prepared the document.

* * *

[E]ven if I got over the authenticity hurdle and said, "It's authentic, you've laid enough of a foundation," and I admitted it, I wouldn't find it to be particularly relevant, given I can't tell what it is, when it was prepared, and I'd give it no weight in the analysis of what the actual liquidations costs were. So I'm not going to admit the document.

*Id.,* pp. 1866–67. The trustee made no follow-up offer of proof to address the court's specific concerns.

■ The bankruptcy court's ruling excluding the evidence is reviewed for abuse of discretion. Because I agree with the bankruptcy court, I conclude that the court did not abuse its discretion and, further, that the court's findings are not clearly erroneous. Accordingly, I affirm each and every ruling challenged in this appeal.

### CONCLUSION

The decision of the bankruptcy court in this adversary proceeding is AFFIRMED in all respects.