**In re AL–BEN, INC.**

**James G. HENDERSON, Trustee for Al–Ben, Inc., Plaintiff,**

**v.**

**NATIONAL BANK OF COMMERCE, et al., Defendants.**

No. 88–12668.

Adv.P. No. 90–0221.

United States Bankruptcy Court, N.D. Alabama, S.D.

Oct. 7, 1991.

Sub–S chapter corporation known as Al-ben, Inc. ("Al–Ben"). Al–Ben was organized to engage in the business of retailing wearing apparel manufactured and distributed primarily by Benneton S.P.A. and related entities. The Falkenburgs are the sole stockholders of Al–Ben.

During 1984 and 1985, Al–Ben obtained three loans from National Bank of Commerce ("NBC") in the aggregate principal amount of $235,000.00 ("the store loans"). The proceeds of the store loans were used by Al–Ben to acquire inventory, furnishings and fixtures for three of its five retail stores. To secure the store loans, Al–Ben granted NBC a first priority security interest in all inventory, equipment, furnishings and fixtures of Al–Ben, wherever located. NBC perfected its security interest by filing UCC–1 financing statements with the Alabama Secretary of State.

On December 19, 1988, an involuntary bankruptcy petition was filed against Al–Ben. Al–Ben thereafter converted the involuntary case to a voluntary proceeding under chapter 11 of the Bankruptcy Code.[2] Al–Ben operated four retail stores as of the filing date, and continued to operate as a debtor-in-possession.

During the year immediately preceding the filing of the petition, NBC received $43,437.63 in payments on account of the store loans. The amount of each payment corresponds with the monthly installments of principal and interest provided in the NBC note to which payment was applied. After the filing of the bankruptcy petition, Al–Ben continued to pay the regular monthly installments due under the terms of the store loans. This practice continued until September 1989, when Al–Ben began making payments of interest only on the store loans. The post-petition payments were intended to compensate NBC for inventory sold free and clear of NBC's security interest after the filing date.

## MEMORANDUM OPINION

ARTHUR B. BRISKMAN, Bankruptcy Judge.

At Birmingham, in said District this 25th and 26th day of July, 1991, before Arthur B. Briskman, Bankruptcy Judge.[1]

This matter came before the Court on the complaint of the trustee, James G. Henderson, to avoid certain transfers to Defendant, National Bank of Commerce. After due consideration of the pleadings, testimony, arguments of counsel and briefs subsequently submitted, the Court makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

### I. Counts One and Two.

In December 1984, Frank and Karle Falkenburg ("the Falkenburgs") formed a

---

**1.** The Honorable Arthur B. Briskman, United States Bankruptcy Judge for the Southern District of Alabama, was transferred to the United States Bankruptcy Court for the Northern District of Alabama to hear this action by virtue of a May 1, 1991 general order of the Judicial Council of the United States Court of Appeal for the Eleventh Circuit.

**2.** 11 U.S.C. § 101 *et seq.*

NBC was fully secured with respect to the store loans as of the filing date. The unpaid balance of the store loans was $112,941.16 as of the filing date. Al–Ben had inventory with a total wholesale value of $197,885.09 as of December 31, 1988.[3] The original cost of furnishings and fixtures in three of the five retail stores was $77,000.00; in the two remaining stores the cost was $98,000.00 and $155,000.00 respectively, for a total of $484,000.00. Installation and transportation represented fifteen per-cent (15%) of the costs. The original cost of the fixtures was not less than $411,400.00. They retained a value of at least $143,850.00, thirty-five per-cent (35%) of their original cost (exclusive of installation and transportation). The total value of NBC's collateral was at least $341,735.09 as of the filing of the filing date.

On December 5, 1989, Al–Ben's chapter 11 case was converted to a proceeding under chapter 7 of the Bankruptcy Code and James G. Henderson was appointed as trustee.

## II. Counts Three and Four.

At issue are two year-end loan transactions between NBC and the Falkenburgs. The first loan transaction occurred in December 1986, when the Falkenburgs requested a loan from NBC in the principal amount of $200,000.00 ("the 1986 year-end loan"). The Falkenburgs informed NBC that they intended to use the proceeds of the 1986 year-end loan to increase their tax basis in the stock of Al–Ben. NBC agreed to the Falkenburgs' request, whereupon the following transactions occurred on December 30, 1986: Frank and Karle Falkenburg each executed and delivered to NBC a promissory note in the principal amount of $100,000.00. NBC then issued two cashier's checks in the amount of $100,000.00 each, payable to Frank and Karle Falkenburg respectively. The checks were then used to purchase a certificate of deposit from NBC payable to Al–Ben in the principal amount of $200,000.00 and maturing on January 6, 1987. The certificate of deposit was pledged to NBC as security for the 1986 year-end loan.

Seven days later, on January 6, 1987, the transactions described above were reversed. Through a series of simultaneous computer entries made by NBC, the $200,000.00 certificate of deposited was debited, the principal amount of the certificate of deposit, together with accrued interest of $230.14, was credited to Al–Ben's checking account, and Al–Ben's checking account was debited in the amount of $200,287.68, which sum was applied in full payment of principal and accrued interest owing under the 1986 year-end loan.

The second loan transaction occurred in December 1987, when the Falkenburgs requested a loan from NBC in the principal amount of $320,000.00 ("the 1987 year-end loan"). As with the 1986 year-end loan, the Falkenburgs intended to loan the proceeds of the 1987 year-end loan to Al–Ben for the purpose of increasing their tax basis in the Al–Ben stock. NBC agreed to the Falkenburgs' request, whereupon the following transactions transpired on December 31, 1987: the Falkenburgs jointly executed a promissory note in the principal amount of $320,000.00, and NBC credited the Falkenburgs' personal checking account in an equal amount. The following simultaneous computer entries were then made by NBC: the Falkenburgs' personal checking account was credited for $320,000.00 and debited in the same amount. A newly opened money market account in Al–Ben's name was credited for $320,000.00. Al–Ben pledged the money market account to NBC as security for the 1987 year-end loan.

---

**3.** The value of the inventory held by Al–Ben on the December 19, 1989 filing date was greater than the value of the inventory held on December 31, 1989 due to the depletion by sale in the ordinary course of Al–Ben's business. The inventory held by Al–Ben on the filing date was delivered on consignment by a corporation known as Stella McKay. Karle Falkenburg, who is also President of Stella McKay, never sent written notice to NBC of its consignment interest in the inventory. Accordingly, NBC's security interest continues as a first lien on the inventory that is superior to Stella McKay's interest. See Alabama Code § 7–9–114 (1984) (secured party must receive notification in writing from consignor before consignee receives possession of the goods).

Sixteen days later, on January 15, 1988, the transactions described above were reversed. NBC again simultaneously entered the following bookkeeping entries: Al–Ben's money market account was debited in the amount of $320,953.84 (the original $320,000.00, plus accrued interest on the money market account). The Falkenburgs' personal checking account was credited in the amount of $320,953.84 and debited in the amount of $321,413.70, which sum was applied to the outstanding principal balance, plus accrued interest, owing under the 1987 year-end loan.

The proceeds of the two year-end loans did not constitute Al–Ben's property. Although the proceeds of both year-end loans were deposited into an account opened in the name of Al–Ben, Al–Ben never exercised control over the funds nor had the right to control the funds. At all times during the transactions, NBC exercised exclusive control over the funds by virtue of the pledge agreements in effect. The funds were never intended for the benefit of Al–Ben or its creditors. It is equally clear that the year-end loan transactions had no perceptible effect on the assets of Al–Ben. A hypothetical comparison of the balance sheet of Al–Ben before each transaction occurred and of Al–Ben's balance sheet after the transactions, shows Al–Ben's assets were not depleted in any respect.

## CONCLUSIONS OF LAW

### I. Count One.

■ The trustee claims all payments made to NBC on account of the store loans during the year preceding the filing date constitute voidable preferential transfers under § 547 of the Bankruptcy Code. Section 547(b)(5) requires a trustee to prove that the transfers in question enabled a creditor to receive more than such creditor would receive if:

(A) the case were a case under chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

11 U.S.C. § 547(b)(5). When a secured creditor is alleged to have accepted a preferential transfer, the trustee has the burden of proving that the value of the creditor's collateral was less than the creditor's claim when the bankruptcy petition was filed, i.e., that the creditor was unsecured or undersecured at the time of bankruptcy. 4 Collier on Bankruptcy ¶ 547.08, at 547–43 (15th ed. 1991).

■ NBC was fully secured on the filing date, December 19, 1988. NBC's claim against AL–Ben on the filing date for purposes of a § 547(b)(5) analysis (i.e., the unpaid balance of the store loans as of the filing date, plus the total amount of the alleged preferential payments) was $156,-351.79. The claim was secured by collateral having a value in excess of $341,735.09. The payments made on the store loans within one year of bankruptcy did not enable NBC to receive more than it would have received in a chapter 7 liquidation of Al–Ben. Therefore, the payments are not avoidable under 11 U.S.C. § 547.

### II. Count Two.

The trustee alleges that the post-petition payments made by Al–Ben to NBC on account of the store loans should be set aside pursuant to 11 U.S.C. § 549, which provides in pertinent part:

the trustee may avoid a transfer of property of the estate ... made after the commencement of the case, and ... that is not authorized under this title or by the court.

NBC was fully secured as of the filing date, having collateral with a value in excess of $341,735.09 securing a claim of $112,941.16. Post-petition payments to NBC released a corresponding amount of assets in which NBC had a security interest.

■ As a debtor-in-possession, Al–Ben was authorized to sell its inventory and use

its fixtures in the ordinary course of business. 11 U.S.C. § 1108.[4] Al–Ben made the post-petition payments to NBC as adequate protection to NBC for the diminution of its collateral, avoiding a protracted hearing.[5] Post-petition payments to a secured creditor are contemplated by 11 U.S.C. § 361;[6] See also, *Kepler v. Independence Bank of Madison, (In re Ford)*, 61 B.R. 913, 918 (Bankr.W.D.Wis.1986) ("... the debtor was authorized to continue to operate his business. That authorization implies the right to continue making payments to secured creditors."). Consequently, the post-petition payments did not deplete Al–Ben's bankruptcy estate in any respect and did not constitute a transfer avoidable by 11 U.S.C. § 549.

### III. Counts Three and Four.

The trustee contends the transfers made by Al–Ben in connection with the year-end loans constitute fraudulent transfers avoidable pursuant to 11 U.S.C. §§ 548 or 544 (in combination with Alabama Code § 8–9–6 (1984)). The threshold inquiry under both § 548 and Ala.Code § 8–9–6 is whether each transfer was in fact property of the debtor. In this regard, the Court is guided by the seminal case of *Nordberg v. Sanchez, (In re Chase & Sanborn Corp.)*, 813 F.2d 1177 (11th Cir.1987). In *Nordberg v. Sanchez*, the Eleventh Circuit Court of Appeals established the following rule for determining whether an alleged fraudulent transfer involved property of the debtor:

[W]here a transfer to a noncreditor is challenged as fraudulent, **more is necessary to establish the debtor's control over the funds than the simple fact that a third party placed the funds in an account of the debtor with no express restriction on their use.** In determining whether the debtor had control of funds transferred to a noncreditor, **the court must look beyond the particular transfers in question to the entire circumstances of the transaction.**

*Nordberg v. Sanchez*, 813 F.2d at 1181–82 (emphasis added).

The circumstances of the year-end transactions indicate the proceeds were never intended for Al–Ben's use or benefit nor did Al–Ben ever acquire control over the proceeds of either year-end loan. Al–Ben never had the ability to use the funds in any respect, whether to pay creditors or for other purposes. Therefore, the year-end loans did not constitute property of the Al–Ben's estate and the transfers did not defraud Al–Ben's creditors and are not subject to avoidance by the trustee.

Fraudulent transfers are avoidable because they diminish the assets of the debtor to the detriment of all creditors. Applying § 548 to transfers the debtor never controlled would enable the estate to receive a windfall in the form of funds that simply pass through the debtor's possession, but in fact were not the property of the debtor. In this instance, the year-end loans did not constitute property of the

4. Section 1108 provides in pertinent part:

[u]nless the court ... orders otherwise, the trustee may operate the debtor's business.
Section 1107 provides in pertinent part:
a debtor-in-possession shall have all the rights ... and powers ... of a trustee serving in a case under this chapter.
Section 363(c) authorized Al–Ben to use property of the estate in the ordinary course of business without notice and hearing.

5. At the April 27, 1989 hearing, the Court was advised that monthly payments were made as adequate protection on the terms of the note. NBC was a fully secured creditor holding a security interest in inventory, fixtures and equipment in the stores. Had payments not been continuously made to NBC, significant at-

torney's fees would have been incurred defending a relief from the automatic stay under 11 U.S.C. § 362. Transcript of April 27, 1989 hearing, at 32–34.

6. In pertinent part, 11 U.S.C. § 361 provides:

When adequate protection is required under section 362, 363, or 364 of this title of an interest of an entity in property, such adequate protection may be provided by—
(1) requiring the trustee to make a cash payment or periodic cash payment to such an entity, to the extent that the automatic stay under section 362 of this title, use, sale, or lease under section 363, or any grant of a lien under section 364 of this title results in a decrease in the value of such entity's interest in such property.

estate and therefore do not constitute fraudulent transfers.