In re SMITH'S HOME FURNISHINGS, INC., Debtor.

Michael B. Batlan, Trustee, Plaintiff–Appellant,

v.

TransAmerica Commercial Finance Corporation, Defendant–Appellee.

No. 99–35946.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Nov. 15, 2000

Filed Sept. 13, 2001

---

K. John Shaffer, Stutman, Treister & Glatt, P.C., Los Angeles, California, for the plaintiff-appellant.

Jennifer L. Palmquist and Lauren E. Winters, Garvey, Schubert & Barer, Portland, Oregon, for the defendant-appellee.

Before: CYNTHIA HOLCOMB HALL, RYMER, and GRABER, Circuit Judges.

CYNTHIA HOLCOMB HALL, Circuit Judge:

Plaintiff-appellant Michael Batlan ("trustee") appeals the district court's judgment affirming the decision of the bankruptcy court. Batlan filed an action to recover payments made by a chapter 11 debtor to defendant-appellee Transamerica Commercial Finance Corporation ("TCFC"). The bankruptcy court found that the payments were not avoidable transfers under 11 U.S.C. § 547(b). We agree with the bankruptcy court and the district court that the trustee did not satisfy his burden of showing that TCFC received a greater amount by virtue of the payments than it would have received in a hypothetical chapter 7 liquidation.

## FACTUAL AND PROCEDURAL BACKGROUND

Smith's Home Furnishings, Inc. ("Smith's"), sold furniture, electronic goods, and appliances at 19 stores in Oregon, Washington, and Idaho. TCFC was one of Smith's primary lenders for almost a decade. TCFC financed Smith's purchase of some merchandise (the "prime inventory"), consisting mainly of electronic goods and appliances. TCFC's loans were secured by a first-priority floating lien on the prime inventory and the proceeds from it.[1] Thus, the prime inventory served as collateral for TCFC's loans to Smith's.

Under the loan agreements, TCFC extended credit to Smith's by granting approval to various manufacturers. After receiving approval, the manufacturers shipped merchandise to Smith's. When Smith's sold a product financed by TCFC, it paid TCFC the wholesale price of that product.

Smith's did not segregate its sales receipts. Instead, Smith's deposited all its sales proceeds into commingled bank accounts at the end of each day. First Interstate Bank ("the Bank"), Smith's revolving-line-of-credit financier, swept the accounts daily, leaving the accounts with overnight balances of zero. The next day, the Bank advanced new funds to Smith's if sufficient collateral was available. Smith's then paid its operating expenses and creditors, including TCFC.[2]

During 1994, Smith's suffered substantial losses. Consequently, in March 1995 TCFC reduced Smith's line of credit from $25 million to $20 million. Over the next few months, TCFC reduced Smith's line of credit twice more, down to $13 million by

---

1. TCFC also held a blanket lien on Smith's other assets; that lien was junior to the prime collateral liens of Smith's other secured creditors.

2. Because of these procedures, the allegedly preferential payments, which we will describe below, were not made directly from the proceeds of the sales of TCFC's collateral.

August. During the same period, TCFC required substantial paydowns of Smith's debt; Smith's paid TCFC most of its available cash in a series of 36 payments, totaling more than $12 million, between May 24, 1995, and August 22, 1995.

On August 18, 1995, TCFC declared a final default, accelerated the entire debt due from Smith's, and sought a receiver for the company. For the first time, TCFC also sought to require Smith's to segregate the proceeds from its collateral.

Smith's voluntarily initiated bankruptcy proceedings under chapter 11 of the Bankruptcy Code on August 22, 1995 (the "petition date"). As of that date, Smith's owed $10,728,809.96 to TCFC. TCFC took possession of its collateral and liquidated it, receiving $10,823,010.58.

On October 11, 1995, the case was converted to a chapter 7 liquidation and Batlan was appointed as trustee. The trustee discovered the $12,842,438.96 in payments that Smith's had made to TCFC during the 90 days before the petition date (the "preference period"). Believing that the payments were preferential, he asked TCFC to return the money to the bankruptcy estate. When TCFC refused, the trustee initiated this adversary proceeding, seeking to avoid the payments as preferential transfers, under 11 U.S.C. § 547(b), and to recover the money for the benefit of other creditors of Smith's, under 11 U.S.C. § 550(a).

The parties stipulated that the payments met the first four elements of a preferential transfer under 11 U.S.C. § 547(b)(1)-(4). Additionally, TCFC agreed not to pursue affirmative defenses under 11 U.S.C. § 547(c)(1)-(2). The parties proceeded to trial to determine whether the payments met the fifth element of the preferential transfer statute, 11 U.S.C. § 547(b)(5), and whether TCFC could establish an affirmative defense under 11 U.S.C. § 547(c)(5).

On September 10, 1998, the bankruptcy court ruled, in a letter opinion, that the trustee had failed to meet his burden of proof in showing that the payments were preferential transfers. The court reasoned that, because the value of the collateral on the petition date ($10,823,010.58) exceeded the amount of TCFC's claim on the petition date ($10,728,809.96), TCFC was oversecured by $94,200.62. As a result, the court concluded that, because TCFC was a floating-lien creditor, the trustee was required to prove that TCFC was undersecured at some time during the preference period in order to avoid the transfers. The court also ruled that TCFC's collateral should be valued at liquidation value ($10,823,010.58) and that liquidation costs should be deducted from the liquidation value in computing the value of the collateral, but that the trustee had failed to present credible evidence of TCFC's liquidation costs. Because the bankruptcy court concluded that the trustee had not proved that the transfers were preferential, the court did not address TCFC's affirmative defense under § 547(c)(5).

The trustee filed a motion for reconsideration. In response, the bankruptcy court amended its opinion to correct typographical and computational errors, but otherwise confirmed its judgment. The trustee timely filed an appeal to the district court, raising the same issues that it raises in this appeal. In a published opinion, *Batlan v. Transamerica Commercial Finance Corp.*, 237 B.R. 765, 776 (D.Or. 1999), the district court affirmed the bankruptcy court's decision "in all respects." This timely appeal followed.

## STANDARDS OF REVIEW

We review de novo the district court's decision on appeal from a bank-

ruptcy court. That is, " '[w]e independently review the bankruptcy court's decision and do not give deference to the district court's determinations.'" *Preblich v. Battley,* 181 F.3d 1048, 1051 (9th Cir.1999) (quoting *Robertson v. Peters (In re Weisman),* 5 F.3d 417, 419 (9th Cir.1993)). We review the bankruptcy court's findings of fact for clear error and its conclusions of law de novo. *Id.* Finally, we review the bankruptcy court's evidentiary rulings for abuse of discretion. *See Ardmor Vending Co. v. Kim (In re Kim),* 130 F.3d 863, 865 (9th Cir.1997).

## DISCUSSION

### I. *"Greater Amount" Test*

■ This case requires us to interpret two sections of the Bankruptcy Code, 11 U.S.C. §§ 547(b)(5) and 547(g). 11 U.S.C. § 547(b) permits a trustee to "avoid any transfer of an interest of the debtor in property" when certain conditions are met. One of the conditions is that the transfer enable the creditor to receive more than such creditor would receive if:

(A) the case were a case under chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

11 U.S.C. § 547(b)(5). TCFC and the trustee dispute whether the 36 payments made during the preference period enabled TCFC, as a result of the 36 payments, to receive more than if the payments had not been made and TCFC had received payments only pursuant to a Chapter 7 liquidation. Section 547(g) places the burden of proof on the trustee to show all of the conditions of § 547(b). Thus, the trustee must show that the creditor received a greater amount than it

would have if the transfer had not been made and there had been a hypothetical chapter 7 liquidation as of the petition date. If the trustee shows that TCFC received a greater amount by virtue of the 36 payments, then the payments are avoidable as preferential transfers. *See In re Lewis W. Shurtleff, Inc.,* 778 F.2d 1416, 1421 (9th Cir.1985). The trustee contends that he satisfied his burden because: 1) the 36 payments plus the amount that TCFC received from the post-petition sale of its collateral is greater than the amount received from the post-petition sale of the collateral standing alone; and 2) TCFC has not traced the source of the allegedly preferential payments to sales of its collateral. We disagree with both of the trustee's arguments.

### A. *The add-back method does not satisfy the trustee's burden when the payments come from collateral secured by a floating lien*

The trustee tried to satisfy his burden under § 547(b)(5) by adding the amount of the 36 payments to the amount TCFC received as a result of the post-petition sale of its remaining collateral. The trustee then compared this amount to the obviously smaller amount of the post-petition sale by itself and concluded that TCFC must have received a greater amount because of the payments. Some bankruptcy courts have used the same "add-back" method employed by the trustee to determine the status of a creditor on the petition date. *See In re Al–Ben, Inc.,* 156 B.R. 72, 75 (Bankr.N.D.Ala.1991) (adding alleged preferences to the amount of unpaid balance at the petition date to find the creditor's secured status); *In re Estate of Ascot Mortgage, Inc.,* 153 B.R. 1002, 1018 (Bankr.N.D.Ga.1993) (adding pre-petition amounts received to what would have been received under a chapter 7 liquidation).

We agree with the bankruptcy court and the district court, however, and conclude that the "add-back" calculation does not satisfy the trustee's burden in this case. Pre-petition transfers to a creditor that is fully secured on the petition date are generally not preferential because the secured creditor is entitled to 100 percent of its claims. *See In re LCO Enterprises,* 12 F.3d 938, 941 (9th Cir.1993). This is not a hard and fast rule. As the bankruptcy court in this case noted, payments that change the status of a creditor from partially unsecured to fully secured at the time of petition may be preferential. *See Porter v. Yukon Nat'l Bank,* 866 F.2d 355, 359 (10th Cir.1989). Moreover, a transfer may be avoided when the creditor is fully secured at the time of payment, but is undersecured on the petition date. *See In re Estate of Sufolla, Inc.,* 2 F.3d 977, 985–86 (9th Cir.1993). The trustee failed to show, however, that TCFC was undersecured *at any time* during the preference period. Instead, the evidence submitted showed that as of the petition date, the value of the collateral held by Smith's exceeded its indebtedness to TCFC.[3] If TCFC was never undercollateralized, then TCFC could not have received more by virtue of the 36 payments than it would have received in a hypothetical liquidation without the payments.

It is important to understand that TCFC did not loan one fixed amount to the debtor; instead, TCFC held a "floating lien." A floating lien is a financing device where the creditor claims an interest in property acquired after the original extension of the loan and extends its security interest to cover further advances. The floating lien is a lien against a constantly changing mass of collateral for a loan value that will change as payments are received and further advances are made. *See* 3 *Norton Bankr.L. & Prac.2d* § 57.23. The cases the trustee cites applying the "add-back" method do not deal with floating liens. It is not correct to assume that the 36 payments gave TCFC more than it would have received if the payments had not been made. Instead, under a floating lien arrangement, those payments are used to liquidate part of the debtor's debt. Then, new credit under the floating lien is extended and is secured by new collateral. It is not enough for the trustee to show that the 36 payments plus the amount received upon dissolution exceeded the amount of TCFC's secured claim as of the petition date. Since collateral and indebtedness changed throughout the preference period, these values do not prove that TCFC received more by virtue of the payments than it would have received without them. Under § 547(b)(5), the trustee must show that the amount of indebtedness under the floating lien was greater than the amount of collateral at some point during the 90–day period. *See In re Schwinn Bicycle Co.,* 200 B.R. 980, 992–93 (Bankr.N.D.Ill.1996) ("At no point in time did the collateral value fall below the outstanding debt, and therefore TIFCO was not preferenced in having received payments on its secured debt.").

The trustee contends that the existence of the floating lien means that the burden is shifted to TCFC under § 547(c)(5). Section 547(c)(5) provides an affirmative defense for creditors when the trustee has

---

**3.** *See Batlan* at 237 B.R. at 772–73 ($10,828,-004.36 in collateral versus $10,738,810 in debt). The trustee contends that the bankruptcy court's determination of the value of TCFC's collateral as of the petition date was in error because it did not deduct for liquidation costs. As discussed below, we agree with the district court that the bankruptcy court did not err in refusing to deduct any amount for liquidation costs on the ground that the trustee did not submit sufficient evidence of the amount of those costs.

successfully demonstrated that the creditor received more from the payments than under a hypothetical liquidation. Section 547(c)(5) insulates the transfer of a security interest in after-acquired property, i.e., a floating lien, provided that the creditor does not improve its position during the preference period. In effect, the trustee contends that the existence of a floating lien means that he does not have to prove that the creditor was undersecured at some point during the 90–day period and therefore received more by virtue of the payments than the creditor would have if the creditor had waited for a chapter 7 liquidation.

We reject the trustee's argument.[4] A floating lien does not shift the burden of showing avoidability to the creditor. The trustee still has to satisfy his burden under § 547(b)(5). The Tenth Circuit has addressed the question of what needs to be shown by a trustee to avoid a transfer financed by the sale of inventory subject to a floating lien. *See In re Castletons*, 990 F.2d 551 (10th Cir.1993). In *Castletons,* the creditor held a floating lien on the debtor's inventory, accounts receivable, and proceeds. The trustee sought to avoid the payments given by the debtor to the creditor during the preference period. The Tenth Circuit affirmed the district court's holding that the trustee failed to show that the creditor received more from the challenged payments than it would

have received in a chapter 7 liquidation. It explained:

> [A]ll payments to [the creditor] came from assets already subject to its security interest. It is further uncontested that the nature of [the creditor's] security interest in debtor's assets was never altered during the preference period.
>
> Under these circumstances, it cannot be said, as § 547(b)(5) requires, the transfers enabled [the creditor] to receive more on its debt than would be available to it in a Chapter 7 distribution.

*Id.* at 555. Essential to the court's holding was its recognition that the creditor held a floating lien: "While the identity of individual items of collateral changed because of sales and subsequent acquisitions of new collateral, the overall nature of [the creditor's] security interest remained the same." *Id.* at 556.

It is true that other courts have evaluated floating lien cases by proceeding directly to the § 547(c)(5) affirmative defense without a discussion of the requirements of § 547(b)(5). *See In re Wesley Indus.*, 30 F.3d 1438, 1443 (11th Cir.1994); *In re Lackow Bros., Inc.*, 752 F.2d 1529, 1530–31 (11th Cir.1985). But in those cases, the parties had stipulated or the bankruptcy court had found that the creditor was undersecured as of the petition date. In

---

4. We also reject the dissent's contention that the "contemporaneous exchange" exception, § 547(c)(1), places the burden on the creditor of showing that it was fully secured throughout the preference period. Section 547(c)(1) was designed to prevent trustees from avoiding payments that were clearly intended to support a new transaction, instead of an antecedent debt, even though the actual payment was not recorded until after the transaction. The classic example is when parties intended a cash sale, one party accepted a check instead of cash, and the party recorded the check several days after the sale. *See In re*

*Vance,* 721 F.2d 259, 261 (9th Cir.1983) ("There is no indication in the legislative history that Congress intended section 547(c)(1) to be a general exception covering a variety of transactions."). While we do not need to set precise limits on the use of the § 547(c)(1) defense for our purposes in this case, we do hold that the defense does not absolve the trustee of his burden under § 547(b)(5). *Cf. In re Bullion Reserve of North America,* 836 F.2d 1214, 1217, 1219 (9th Cir.1988) (applying the contemporaneous exchange exception only after concluding that the trustee had satisfied § 547(b)(5)).

other words, the § 547(b)(5) burden had already been satisfied so it did not need to be discussed. The trustee in this case never showed that TCFC was undersecured at any point during the 90–day period and the bankruptcy court determined that TCFC was fully secured as of the petition date. The trustee did not satisfy his burden. *See* Richard F. Duncan, *Preferential Transfers, the Floating Lien, and Section 547(c)(5) of the Bankruptcy Reform Act of 1978,* 36 Ark. L.Rev. 1, 20 (1987) ("[I]t is not necessary to reach the question of application of section 547(c)(5) until after the trustee has met his burden of proving all of the necessary elements of a preference under section 547(b)."); James J. White & Daniel Israel, *Preference Conundrums,* 98 Com. L.J. 1, 4 (1993) ("It is important to remember, however, that 547(c)(5) applies only to a creditor who is undersecured ninety days before bankruptcy. The creditor who is fully secured cannot be attacked under 547(b). There is no initial deficiency and later transactions cannot improve the creditor's position.").

### B. *The burden of tracing the funds used to make the preferential payments is on the trustee*

■ The trustee contends that its use of the "add-back" method is correct because TCFC has not shown that the source of the allegedly preferential payments was sales of TCFC's collateral. In *Castletons,* it was undisputed that all of the preference period payments came from sales of assets subject to the creditor's floating lien. *See In re Castletons,* 990 F.2d at 555. In this case, however, the payments came from a commingled account that contained monies from the sales of other goods not subject to TCFC's lien. When Smith's made a sale, the proceeds were deposited into commingled bank accounts. Smith's bank swept the accounts daily, leaving them with zero balances overnight. Thus, the challenged payments were not made directly from the proceeds of the sales of TCFC's collateral. On the other hand, there is no evidence indicating that Smith's did not sell off enough of TCFC's collateral to account for all of the challenged payments.

There is some authority for requiring a creditor to establish that funds in a commingled account are traceable to the proceeds of its collateral. *See Stoumbos v. Kilimnik,* 988 F.2d 949, 957 (9th Cir.1993) ("This court has held that the creditor bears the burden of establishing that a deposit account contains proceeds of collateral covered by a security interest."); *In re Gibson Products,* 543 F.2d 652, 657 (9th Cir.1976) ("We think that it is fair to place the burden on the creditor to identify his own proceeds and thus to defeat, in whole or in part, the trustee's claim of preference."). But *Stoumbos* and *Gibson Products* are not persuasive because they dealt with the intersection of the Bankruptcy Code and section 9–306(4) of the UCC. The UCC provision at issue in those cases allows a creditor to claim *all* funds in a deposit account where the funds are proceeds from collateral covered by the creditor's security interest. *See Stoumbos,* 988 F.2d at 957. In this situation, there is a presumption against the creditor and in favor of the trustee. *Id.* at 957–58. This is the opposite of a § 547(b) analysis where the burden of proof is on the trustee and the presumption is in favor of the creditor. *See In re Lease–A–Fleet, Inc.,* 151 B.R. 341, 347–49 (Bankr.E.D.Pa.1993) (acknowledging that under a Code section other than § 547, a secured creditor may be obliged to prove the validity of its alleged security interests, but explaining that " § 547 is a self-contained Code section which provides its own specific desig-

nations of the burdens of proof of the respective parties").

Instead, we believe that it is part of the trustee's § 547(b)(5) burden to trace the funds used to make the payments to sales of merchandise not subject to TCFC's liens. *See In re Robinson Bros. Drilling, Inc.,* 6 F.3d 701, 703 (10th Cir.1993) ("Under 11 U.S.C. § 547(g), a trustee seeking to avoid an allegedly preferential transfer under § 547(b) 'has the burden of proving by a preponderance of the evidence every essential, controverted element resulting in the preference.' ") (quoting 4 *Collier on Bankruptcy* ¶ 547.21[5] at 547–93 (15th ed.1993)); *cf. In re Prescott,* 805 F.2d 719, 726–27 (7th Cir.1986) (placing burden on trustee to establish value of collateral and to show that value of collateral was less than the amount of indebtedness at time of transfer). One might argue that the creditor will be in a better position than the trustee to prove whether or not the alleged preferential payments came from the proceeds of the sale of its own collateral. On the other hand, in bankruptcy, it is the trustee who accedes to the debtor's books and records and has easier access and a better ability to divine the financial activities of the debtor in its last months of operation. Regardless of which side is better equipped to decipher the debtor's final financial actions, we hold that the language of the statute places the burden of demonstrating the source of such pref-erential payments squarely on the trustee.[5] *See In re Lease–A–Fleet,* 151 B.R. at 348 ("It is therefore an unfortunate fact of life that a preference plaintiff must effectively prove a negative (that the defendant is not a totally secured creditor), even though the secured creditor is the party with most access to proof of the validity of its own security interests.").

Commingled funds or not, § 547(b)(5) places the burden on the trustee to show that the payments at issue came from a source other than sales of TCFC's collateral. Here there is no suggestion that any sales of products funded by TCFC were not subject to TCFC's priority lien. Instead, both parties stipulated that TCFC held a valid security interest in Smith's property. It is true that the route the payment took to TCFC was indirect, but we are not prepared to release the trustee from his burden under § 547(b)(5) simply because the payments did not, demonstrably, come directly from sale of TCFC's collateral. *See In re Compton Corp.,* 831 F.2d 586, 591 (5th Cir.1987) ("The federal courts have long recognized that '[t]o constitute a preference, it is not necessary that the transfer be made directly to the creditor.' ") (quoting *National Bank of Newport v. National Herkimer County Bank,* 225 U.S. 178, 184, 32 S.Ct. 633, 56 L.Ed. 1042 (1912)). It is up to the trustee to show that the payments did not come from TCFC's collateral before he can use

---

5. Our decision furthers the paramount policy behind § 547: equality of distribution among creditors of the debtor. *See In re Schwinn Bicycle Co.,* 200 B.R. 980, 993 (Bankr.N.D.Ill. 1996). If a floating lien creditor genuinely did not profit from a preference period transfer, then the creditor should not be forced to disgorge those payments. We agree with the dissent that § 547 also tries to dissuade creditors from rushing to extract payments from the debtor shortly before bankruptcy. We do not think that our decision controverts this policy or that this is a case involving a race to the debtor's assets. The trustee offered no evidence that TCFC was less than 100 percent secured at the time of any of the 36 payments. For the payments it made to TCFC, the debtor received additional financing to keep its business afloat. Rather than encouraging a race to dismember the debtor, our decision to place the burden on the trustee to show that TCFC did not receive more by virtue of the payments than it would under a hypothetical liquidation encourages TCFC and other creditors to continue extending credit under floating liens.

the add-back method to satisfy his § 547(b)(5) burden.

## II. *Liquidation Costs*

The trustee also argues that the bankruptcy court erred when it concluded that the trustee failed to prove liquidation costs. In the alternative, the trustee contends that the court was required to estimate liquidation costs. We disagree with both contentions.

As evidence of liquidation costs, the trustee presented deposition testimony by TCFC's manager of Portfolio Administration during the liquidation. The manager testified that TCFC had incurred costs in liquidating the collateral, but that he did not know the amount of the costs. He also testified that he had prepared an analysis of *projected* costs two months before the bankruptcy, but admitted that the numbers involved were "real rough number[s] out of the air." The bankruptcy court gave no weight to this testimony, observing that the witness admitted that he did not know the actual costs and that his estimates were plucked "out of the air."

The trustee also presented expert testimony as evidence of liquidation costs. The expert testified generally about the *types* of costs that arise in a liquidation. The court gave this testimony no weight because it was not probative of the *actual* costs of liquidation incurred by TCFC.

The trustee additionally presented testimony from TCFC's senior counsel that TCFC did incur some liquidation costs, and from a TCFC portfolio manager that TCFC had employed people to oversee the liquidation. The bankruptcy court did not err when it concluded that the evidence was not sufficient to prove liquidation costs. Even though the evidence demonstrates that some costs were incurred, that is not sufficient to establish the amount of those costs.

Neither was the court required to estimate the costs simply because the evidence established that TCFC had incurred some. Although bankruptcy courts have estimated liquidation costs, *see, e.g., In re Martindale,* 125 B.R. 32, 35–36 (Bankr.D.Idaho 1991), as the district court noted in this case: "The evidence presented to the bankruptcy court in this case fell far short of the 'precise projections' proffered in *Martindale . . . .* No one, much less the trustee, offered the court evidence from which a reasoned estimate could be made." *Batlan,* 237 B.R. at 776. Consequently, the bankruptcy court did not err when it declined to estimate liquidation costs on this record.

Finally, the court did not abuse its discretion when it refused to admit into evidence the trustee's proposed exhibit 54, a chart entitled "Smith's" that appears to show expenses for Smith's in Oregon, Washington, and Idaho during the period from August 1995 through April 1996. The trustee provided no testimony as to what the document illustrates. It is unclear whether it represents *estimates* of costs or *actual* costs. Consequently, it is not probative of the actual amount of liquidation costs incurred by TCFC.

## CONCLUSION

We affirm the decision of the bankruptcy court in all respects.

GRABER, Circuit Judge, concurring in part and dissenting in part:

I concur in Part II of the majority's opinion but respectfully dissent from Part I. In my view, under 11 U.S.C. § 547(b)(5) and (g) a bankruptcy trustee need not prove, as part of the prima facie case establishing an avoidable preference, that a creditor was not fully secured at the time

of the allegedly preferential payment, when the value of the collateral on the petition date exceeds the creditor's claim on the petition date.

To establish a prima facie case that a payment to a creditor was preferential, the trustee must show that the payment enabled the creditor to receive more than it would have in a chapter 7 proceeding had the payment not been made. 11 U.S.C. § 547(b)(5) & (g); *see also* 3 Norton Bankr.L. & Prac.2d § 57:9, at 57–39 (West 1997) ("[A] two-part analysis is required. First, one must determine what the creditor receives if the transfer remains valid. Second, one must determine what the creditor would have received in a liquidation case *if the transfer had not been made.* The appropriate date for this analysis is the date of the petition filing." (emphasis added; footnote omitted)). "Whether a creditor has received a preference is to be determined, not by what the situation would have been if the debtor's assets had been liquidated and distributed among his creditors at the time the alleged preferential payment was made, but by the actual effect of the payment as determined when bankruptcy results." *Palmer Clay Prods. Co. v. Brown,* 297 U.S. 227, 229, 56 S.Ct. 450, 80 L.Ed. 655 (1936); *see also Alvarado v. Walsh (In re LCO Enters.),* 12 F.3d 938, 942 (9th Cir.1993).

The bankruptcy court and the majority err in two ways. First, by holding that TCFC was fully secured for purposes of § 547(b)(5) analysis, they disregard the statutory directive to determine what the status of TCFC's claims would have been had the challenged payments not been made. Second, by holding that the trustee was required to prove that TCFC was undersecured on the date of each challenged payment, they effectively shift to the trustee a burden of proof placed on TCFC by the Bankruptcy Code.

**1. *For purposes of § 547(b)(5), TCFC was not fully secured.***

Although we have recognized that "[p]re-petition payments to a fully secured creditor generally 'will not be considered preferential because the creditor would not receive more than in a chapter 7 liquidation,'" *Committee of Creditors Holding Unsecured Claims v. Koch Oil Co. (In re Powerine Oil Co.),* 59 F.3d 969, 972 (9th Cir.1995) (quoting 5 Collier on Bankruptcy ¶ 547.08, at 547–47 (Lawrence P. King ed., 15th ed.1995)), our previous cases have not defined what it takes to make a creditor "fully secured" within the meaning of § 547(b)(5). The mere fact that the value of a creditor's collateral exceeds the bankrupt's indebtedness in a "snapshot" on the petition date does not establish that a creditor is fully secured for purposes of § 547(b)(5) analysis. *See Official Comm. of Unsecured Creditors v. Am. Sterilizer (In re Comptronix Corp.),* 239 B.R. 357, 362–63 (Bankr.M.D.Tenn.1999) (holding that a creditor cannot defeat a claim of preference merely by showing that the debt is fully secured on the petition date). Instead, § 547(b)(5) requires the court to determine what the status of the creditor's claims would have been *had the challenged payments not been made. See Wickham v. United Am. Bank (In re Property Leasing & Mgmt., Inc.),* 46 B.R. 903, 911 (Bankr.E.D.Tenn.1985) ("[T]he only relevant question is what the secured status of the claim would have been [had the payments not been made] on the date of the petition since that alone would determine the distribution to which [the creditor] would have been entitled in a chapter 7 liquidation."). Only then can the court analyze whether, and to what extent, the payments caused a creditor to receive more than it would have in a hypothetical chapter 7 liquidation.

To summarize, 11 U.S.C. § 547(b)(5) directs a court that is analyzing a preference claim to compare two quantities: the amount that the creditor actually received, and the amount that the creditor would have received in a hypothetical chapter 7 liquidation had the allegedly preferential transfers not been made. *Elliott v. Frontier Props. (In re Lewis W. Shurtleff, Inc.)*, 778 F.2d 1416, 1423 (9th Cir.1985). To the extent that challenged payments permit the creditor to receive more than it would have in the hypothetical liquidation, the trustee can avoid them. 11 U.S.C. § 547(b). The statute contains no exception for a "floating-lien" creditor.[1]

### a. *Aggregated Analysis*

Although the text of the Code directs the court to examine each challenged payment individually,[2] for simplicity, I will analyze them in the aggregate because the result is the same under either approach on these facts.[3] The result is the same here because: (1) TCFC's collateral was not the source of the allegedly preferential payments, so the return of the payments to the estate would not increase the value of the collateral securing Smith's indebtedness to TCFC; (2) TCFC already received the full value of its collateral; (3) each payment allowed TCFC to receive an amount in excess of the value of its collateral; (4) TCFC's claim was unsecured to the extent that it exceeded the value of the collateral; and (5) other creditors with unsecured claims received no payments on those claims.[4]

### b. *What TCFC Actually Received*

In analyzing the amount that a challenged transfer enabled the creditor to receive, the "creditor must be charged with the value of what was transferred *plus* any additional amount that he would be entitled to receive from a Chapter 7 liquidation." *Shurtleff*, 778 F.2d at 1421 (emphasis in original). The challenged

---

1. *Henderson v. National Bank of Commerce (In re Al–Ben, Inc.)*, 156 B.R. 72 (Bankr. N.D.Ala.1991), supports my analytical approach, rather than the majority's. That case actually applied the add-back method endorsed in this dissent. The court there found no preference only because the value of the collateral exceeded the amount of debt even after the challenged payments were "added back."

2. *See* 11 U.S.C. § 547(b) (providing that "the trustee may avoid any *transfer* of an interest of the debtor in property" (emphasis added)); *cf.* 11 U.S.C. § 547(c)(5) (requiring an analysis of "the aggregate of all such transfers" to determine whether the specified affirmative defense is applicable).

3. An aggregated analysis may not yield the same results as a payment-by-payment analysis under different circumstances, for example: (1) when the creditor has not been paid the value of its collateral at the time of the preference claim; (2) when the source of some or all of the pre-petition payments was the creditor's collateral; or (3) when the estate has sufficient assets to pay something toward unsecured claims.

4. The § 547(b)(5) analysis for an individual payment differs depending on whether the payment renders the creditor partially secured or fully secured in the hypothetical liquidation. If the creditor is partially secured, then it is entitled to collect the value of its secured claim, i.e., the value of its collateral. 11 U.S.C. § 506(a). If the creditor is fully secured, then it is authorized to collect the value of its claim plus reasonable fees authorized by the security agreement *up to* the value of its collateral. 11 U.S.C. § 506(b). In either instance, in a case like this where (a) the challenged payments did not come from the creditor's collateral and (b) unsecured creditors will not be paid on any of their claims, a secured creditor's *maximum recovery* is the value of its collateral on the petition date. Because each payment enabled TCFC to receive the value of that payment *in addition to* the value of the collateral, which it already received in full, each payment was preferential.

payments ($12,842,438.96) and the liquidation of TCFC's collateral ($10,823,010.58) caused TCFC to receive a total of $23,665,449.54.

### c. *TCFC's Entitlement in a Hypothetical Chapter 7 Liquidation*

As explained above, 11 U.S.C. § 547(b)(5) instructs us to analyze how much TCFC would have received in a chapter 7 liquidation conducted on the petition date, had the challenged payments not been made. The return of the payments to the estate potentially alters two quantities: (1) the amount of the creditor's claim against the estate on the petition date and (2) the amount of collateral securing the creditor's claim on the petition date. Those two quantities ultimately determine the extent to which a creditor is secured for purposes of § 547(b)(5).

### (i) *TCFC's Claim Against the Estate*

In this case, had the payments not been made, Smith's would have owed TCFC $10,728,809.96 (its actual claim on the petition date) plus $12,842,438.96 (the amount of antecedent debt paid in the preference-period transfers), or a total of $23,571,248.92. Thus, TCFC's hypothetical claim against the estate, in an analysis under § 547(b)(5), is $23,571,248.92. *See Henderson v. Nat'l Bank of Commerce (In re Al–Ben, Inc.)*, 156 B.R. 72, 75 (Bankr. N.D.Ala.1991) (holding that the creditor's claim on the petition date "for purposes of a § 547(b)(5) analysis" was "the unpaid balance of the store loans as of the filing date, plus the total amount of the alleged preferential payments"); *see also, e.g., Gray v. A.I. Credit Corp. (In re Paris Indus. Corp.)*, 130 B.R. 1, 3–4 (Bankr. D.Me.1991) (computing the amount of the creditor's claim for purposes of § 547(b)(5) by adding the amount of the challenged payments to the amount of the creditor's claim on the petition date); *Property Leasing & Mgmt.*, 46 B.R. at 911–12 (same).

### (ii) *The Value of the Collateral*

Although the relevant date for assessing the value of the collateral securing a creditor's debt is the petition date, *see Palmer Clay Prods.*, 297 U.S. at 229, 56 S.Ct. 450; *LCO Enters.*, 12 F.3d at 942, § 547(b)(5) requires an adjustment to that amount when the source of the allegedly preferential payments was the secured party's collateral. *See Krafsur v. Scurlock Permian Corp. (In re El Paso Refinery)*, 171 F.3d 249, 254–55 (5th Cir.1999) ("[T]he creditor will not be deemed to have received a greater percentage as a result of the payment if the source of the payment is the creditor's own collateral."); *Sloan v. Zions First Nat'l Bank (In re Castletons, Inc.)*, 990 F.2d 551, 554–55 (10th Cir.1993) (concluding that a secured creditor was not preferred when all the challenged payments were from assets subject to the creditor's security interest). The reason for the adjustment is that, when the source of the payments is the creditor's own collateral, then, had the payments not been made, the assets would have remained in the estate as part of the collateral securing the creditor's debt. To that extent, the value of the collateral securing the creditor's debt would be greater. *See El Paso Refinery*, 171 F.3d at 255 ("A creditor who merely recovers its own collateral receives no more as a result than it would have received anyway had the funds been retained by the debtor, subject to the creditor's security interest.").

In this case, the trustee presented evidence that 31 of the challenged payments were from commingled funds that were *not* traceable to proceeds of TCFC's collateral. The other 5 payments were from debtors who owed money to Smith's and

who, at Smith's direction, sent the payments to TCFC on behalf of Smith's. Accordingly, had the payments not been made, *all* the funds would have been unencumbered and available to pay unsecured claims.[5]

Because the challenged payments were not traceable to TCFC's collateral, the trustee established a prima facie case that the payments were avoidable preferences by proving that: (1) the value of the collateral was $10,823,010.58, its worth as of the petition date; and (2) the creditor's claim, as calculated above, was $23,571,248.92. Under 11 U.S.C. § 506(a), a creditor's claim "is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property ... and is an unsecured claim to the extent that the value of such creditor's interest ... is less than the amount of such allowed claim." TCFC held a secured claim for $10,823,010.58, the extent of the value of the collateral, and an unsecured claim for the remainder. Because the unsecured creditors of Smith's received no payments on their claims in this proceeding, TCFC would have been paid in full on its secured claim only. Thus, in a hypothetical chapter 7 liquidation, TCFC would have recovered only $10,823,010.58. Clearly, as illustrated in the charts in the Appendix, the payments enabled TCFC to receive more: $23,665,449.54. The trustee is entitled to recover the excess ($12,842,438.96) as a preference under 11 U.S.C. § 547, unless TCFC proves its affirmative defense.

2. *The bankruptcy court and the majority improperly require Smith's to prove the absence of TCFC's affirmative defense.*

The bankruptcy court held, and the majority agrees, that the trustee did not meet his burden of proof in establishing his prima facie case because the trustee's proof does not establish that TCFC was undersecured at the time the payments were made. (Majority op. at 13142.) In so holding, the majority improperly requires the trustee to prove the absence of the creditor's affirmative defense as part of his prima facie case.

A payment to a fully secured creditor is not preferential because the payment does not deplete the bankruptcy estate. 3 Norton Bankr.L & Prac.2d § 57:9. "For example, payment to a fully secured creditor does not diminish the value of the estate since, while cash is removed from the estate, the secured party's lien is reduced in equal amount." *Id.* § 57:9, at 57–42. Thus, the reason why a creditor who is fully secured at the time of a challenged payment cannot be considered "preferred" by a pre-petition payment is that the creditor, in general, contemporaneously returns value to the estate in the form of an equal reduction of the lien.

Under 11 U.S.C. § 547(c)(1), a trustee cannot avoid a payment to a creditor if the creditor establishes that the payment "was intended by the debtor and the creditor ... to be a contemporaneous exchange for new value given to the debtor" and was "in fact a substantially contemporaneous ex-

---

**5.** On appeal, TCFC does not dispute the trustee's characterization of the source of the challenged payments. Moreover, in this circuit, in a bankruptcy proceeding, a secured creditor bears the burden of establishing that funds in a commingled account are traceable to the proceeds of its collateral and thus covered by its security interest. *See, e.g., Stoumbos v. Kilimnik,* 988 F.2d 949, 957 (9th Cir.1993);

*see also Ariz. Wholesale Supply Co. v. Itule (In re Gibson Prods. of Ariz.),* 543 F.2d 652, 657 (9th Cir.1976) (stating general rule that a creditor's security interest in proceeds in a commingled account is "presumptively preferential" as to the trustee, except to the extent the creditor can trace its proceeds). TCFC does not attempt to trace the payments to proceeds of its collateral.

change." *See also* 11 U.S.C. § 547(g) (allocating the burden of proof to the creditor). We have recognized that the release of a security interest to the extent of a payment is one form of "new value" that a creditor may give in exchange for the debtor's payment. "[P]ayments by a debtor in exchange for a secured creditor's release of its security interest falls within the exception of section 547(c)(1)." *O'Rourke v. Seaboard Sur. Co. (In re E.R. Fegert, Inc.),* 887 F.2d 955, 959 (9th Cir. 1989); *see also Sulmeyer v. Pac. Suzuki (In re Grand Chevrolet, Inc.),* 25 F.3d 728, 734 (9th Cir.1994) (holding that, for purposes of § 547(c)(1), a creditor confers new value on the debtor's estate by releasing security interests). Thus, 11 U.S.C. § 547(c)(1) permits a creditor to defend against a trustee's claim of preferential payment by establishing that it contemporaneously released a valid security interest in the debtor's property to the extent of an allegedly preferential payment.

By requiring the trustee to show that the creditor was not fully secured on the date of each payment, the bankruptcy court and the majority effectively require the *trustee* to prove the absence of the creditor's affirmative defense, i.e., that the creditor did not contemporaneously exchange new value with the debtor. This is contrary to the statute. Subsections 547(c)(1) and 547(g) plainly require the *creditor* to show, in order to defeat the trustee's claim of preference, that the creditor contemporaneously released a valid security interest, or otherwise gave new value, to the extent of the payment that it received.

This result is not changed by the fact that the security interest at issue is a floating lien. The text of the statute does not differentiate between payments made on debts secured by floating liens and payments made on debts secured by other types of liens. *See* 11 U.S.C. § 547(b). Although it may be unwieldy for a creditor to prove that, for each payment made on a debt secured by a floating lien, it contemporaneously extended new credit, released a security interest, or otherwise gave new value, that is what the statute requires. My conclusion is buttressed by the fact that, when Congress has determined that the unique character of a floating lien demands special treatment in bankruptcy, it has provided expressly for differential treatment. *See* 11 U.S.C. § 547(c)(5) (providing that floating liens on inventory and receivables cannot be avoided as preferences except to the extent that they permit a creditor to improve its position during the preference period).

Neither is this result changed by the creditor's decision, for whatever reason, to forego reliance on a defense under 11 U.S.C. § 547(c)(1), or by any perceived unfairness in the outcome. Strategic and equitable considerations cannot rewrite the Bankruptcy Code.

In sum, because the statute places the burden on the creditor to show that it gave new value in exchange for payments received, the bankruptcy court and the majority err in concluding that the trustee had failed to meet his burden of proof under 11 U.S.C. § 547(b)(5).

3. *The majority reverses the statutory incentives by encouraging a "race of diligence."*

The majority holds that, in a floating-lien case, the trustee must show that the creditor was undersecured at some specific time during the preference period, in addition to using the statutory add-back method. In the previous sections I have explained that there is no textual support in the statute for this proposition, nor for treating a floating lien differently.

Additionally, the rule adopted by the majority undermines one of the articulated policies underlying § 547: "The operation of the preference section [is] to deter 'the race of diligence' of creditors to dismember the debtor before bankruptcy furthers the second goal of the preference section—that of equality of distribution." H.R.Rep. No. 595, 95th Cong., 1st Sess. 177–178 (1977), U.S.Code Cong. & Admin. News 1978, pp. 5787, 6138 (as quoted in *Schwinn Plan Comm. v. Transamerica Ins. Fin. Corp. (In re Schwinn Bicycle Co.)*, 200 B.R. 980, 993 (Bankr.N.D.Ill.1996)). The rule stated by the majority encourages secured creditors to engage in precisely that type of "race of diligence." Creditors who fear that a debtor is facing bankruptcy will want to extract enough payments from the debtor to make sure that, on the petition date, the value of their remaining collateral exceeds the amount of indebtedness.

Consider this example of two similarly-situated creditors: Suppose that Debtor transfers $30,001 to Creditor 1 during the preference period (not from the Creditor 1's collateral), in payment of a debt secured by a floating lien. As of the petition date, Debtor owes $9,999 to Creditor 1, secured by a lien on $10,000 of collateral. By contrast, suppose that, during the same period, Debtor transfers $29,999 to Creditor 2 (likewise, not from Creditor 2's collateral) in payment of a debt secured by a floating lien. On the petition date, the value of Creditor 2's collateral is $10,000 and the remaining debt is $10,001.

In this hypothetical, the creditors are similarly situated, but the majority's method of analysis would give Creditor 1 more protection and alter what the trustee must show to sustain his burden of proof. Following the logic of the majority, Creditor 2 will be found to have received a preference unless it can raise one of the § 547(c) defenses. On the other hand, Creditor 1, by virtue of the fact that it received a $2 greater transfer of the debtor's assets, can withstand a preference attack because the trustee must establish that, at some point before the petition date, the value of the collateral was less than the amount of debt. This differential treatment provides an incentive for the creditors to race to "dismember" the debtor in the hopes of making it harder for the trustee to prove a preference.

The advantage of the approach that I propose is that it treats Creditor 1 and Creditor 2 identically and requires the trustee to prove the same information with respect to both. That identical approach is consistent with the text of § 547(b), which does not provide a textual basis for distinguishing between the two creditors.

In conclusion, I agree that we must affirm the bankruptcy court's rulings with respect to liquidation costs. On the other hand, I would hold that the bankruptcy court erroneously applied 11 U.S.C. § 547(b)(5) and, accordingly, dissent from the majority's contrary decision.

## APPENDIX
### TOTAL AMOUNT THAT TCFC HAS RECEIVED BECAUSE OF PAYMENTS

| | | |
|---|---|---|
| Amount of payments that TCFC received during the preference period | | $12,842,438.96 |
| Amount that TCFC received from its collateral | + | $10,823,010.58 |
| Total amount that payments enabled TCFC to receive | = | $23,665,449.54 |

### TCFC'S ENTITLEMENT HAD PAYMENTS NOT BEEN MADE

| | | |
|---|---|---|
| Value of TCFC's collateral had payments not been made (*i.e.* measure of TCFC's secured claim) | | $10,823,010.58 |
| Amount that TCFC would receive on an unsecured claim | + | $ 0 |
| Total amount that TCFC would receive in a hypothetical chapter 7 liquidation had payments not been made | = | $10,823,010.58 |

### COMPARISON:
### WHAT THE PAYMENTS ENABLED TCFC TO RECEIVE VERSUS TCFC'S ENTITLEMENT IN A CHAPTER 7 LIQUIDATION HAD THE PAYMENTS NOT BEEN MADE

| | | |
|---|---|---|
| Total amount that TCFC received because of challenged payments | | $23, 665,449.54 |
| Total amount that TCFC would be entitled to receive in the absence of the challenged payments | - | $10,823,010.58 |
| Total preferential effect of payments | = | $12,842,438.96 |